Indictment for murder. The defendant was charged with the murder of Lucinda Price. It appears that he had a wife, who lived in Charlotte, and that he had for some time previous to the homicide been living in Salisbury with the deceased.
Lee Scott, a witness for the State, testified: "I am cousin to defendant, James Cooper; saw him on 28 March, this year, at Leroy Lyerly's house; Rose Smith and Lucinda Price were there; it was about 7 or 8 o'clock in the evening; Rose Smith was sitting next to the fireplace in the back room. Lucinda Price, the deceased, asked Jim Cooper why he did not go home; Jim said nothing; in about fifteen minutes James Cooper left; did not say anything; was gone about twenty minutes, and came back; came in the front door with a shotgun; stepped up into the door behind me. Lucinda Price, deceased, was near the door and was just getting up; she hollered and Jim Cooper shot her; she tried to run from him and was on the right side, close to the door. He shot her once. He ran out of the door and said nothing. I saw him next after he was arrested on Thursday; the killing was on Saturday. I never heard Jim Cooper and Lucinda Price talking together. I did hear him ask Lucinda if she was going to leave, two or three weeks before the killing. She lived about two or three minutes after he shot. I saw her after she died."
Claude Hoskin, witness for the State, testified substantially to the same facts.
The cross-examination of the witnesses for the State and the testimony of the defendant's witnesses indicated that the defense was insanity, and the prisoner was allowed the benefit of this plea.
The prisoner appealed from the judgment upon a verdict finding him guilty of murder in the first degree. (721)
After stating the case: The first exception was taken to the testimony of the policeman, M. N. Earnhardt, who was allowed to *Page 810 
state what the defendant said to him after he was arrested and when the officer asked him "what he wanted to kill the woman for."
The third exception was taken to the testimony of the sheriff, as to the statement made by the defendant to him after his arrest.
Statements made to an officer are not incompetent simply because the defendant was at the time in custody or even in jail, if they are voluntary. S. v. Exum, 138 N.C. 600; S. v. Homer, 139 N.C. 603; S. v.Bohanon, 142 N.C. 695; S. v. Smith, 138 N.C. 700; S. v. Jones, 145 N.C. 466. Besides, this testimony was competent, as showing the state of the prisoner's mind at the time of the homicide, as words, acts, and conduct are competent for this purpose, they being natural evidence.
The prisoner objected to a question asked the sheriff by the solicitor: "From what you have seen of the defendant while in jail, state whether or not, in your opinion, he knows right from wrong." The ground of the objection was that the inquiry as to the defendant's mind should be confined to the time of the killing. "On a prosecution for murder, defended on the ground of insanity, evidence of acts, conduct, and declarations of the accused before and after as well as at the time of the commission of the act charged is competent, provided the inquiry does not call for evidence which is too remote." 21 Cyc., 948; 12 Cyc., 403; 1 Wharton's Cr. Ev. (10 Ed.), sec. 55, p. 236.
It is well settled that where the particular state of mind of a person is a relevant fact, declarations which indicate its existence are admissible as circumstantial evidence, and are considered as primary evidence, notwithstanding that the declarant is available as a witness. Within the bounds of relevancy, the declarations may precede, accompany, or follow the occurrence of the principal act. 16 Cyc., 1180, 1181, 1182.Judge Brewer said in Mooney v. Olsen, 22 Kansas, 69, 77: "A man's words show his mental condition. It is common to prove insanity by the party's sayings as well as by his acts. One's likes and dislikes, fears and friendships, hopes and intentions, are shown by his utterances. So that it is generally true that whenever a party's state of mind is a subject of inquiry his declarations are admissible as evidence thereof. In other words, a declaration which is sought as mere evidence of an external fact, and whose force depends upon its credit for truth, is always mere hearsay if not made upon oath; but a declaration which is sought as evidence of what the declarant thought or felt, or of his mental capacity, is of the best kind of evidence." In Waterman v. (722) Whitney, 11 N.Y. 157, which presents a careful analysis of this matter, Justice Selden says: "The difference is certainly very obvious between receiving the declarations of a testator to prove a distinct external fact, such as duress or fraud, for instance, and as evidence merely of the mental condition of the testator. In the former *Page 811 
case it is mere hearsay, and liable to all the objections to which the mere declarations of third persons are subject, while in the latter it is the most direct and appropriate species of evidence." Declarations are competent not only to show insanity, but also weakness of the mental faculties. 16 Cyc., 1181. This Court, by Smith, C. J., in McLeary v.Norment, 84 N.C. 235, 237, states the rule very clearly and the reasons underlying it. It was there objected that an interested witness could not testify to such declarations being excluded by C. C. P., sec. 343 (Code of 1883, sec. 590; Revisal of 1905, sec. 1631), and the Court met the objection in this way; "The conversations offered are not to prove any fact stated or implied, but the mental condition of the plaintiff, as declarations are received to show the presence of disease in the physical system. How, except through observation of the acts and utterances of a person, can you arrive at a knowledge of his health of body or mind? As sanity is ascertained from sensible and sane acts and expressions, so may and must any conclusion of unsoundness be reached by the same means and the same evidence. The declarations are not received to show the truth of the things declared, but as evidence of a disordered intellect, of which they are the outward manifestations. Would it not be competent to show an attempt at self-destruction? And do not foolish and irrational utterances equally tend to show the loss of reason when proceeding from the same person? In either case the conduct and the language may be feigned and insincere; but this will only require a more careful scrutiny of the evidence, and does not require its total rejection."
How better can we judge of a man's physical or mental state than by what he says or what he does? Greenleaf on Evidence (Redf. Ed.), sec. 102, says: "Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings, made at the time in question, are also original evidence. If they were the natural language of the affection, whether of body or mind, they furnish satisfactory evidence, and often the only proof, of its existence; and whether they were real or feigned is for the jury to determine." LordJustice Mellish held that such evidence was admissible, not under theres gestae notion, nor as original evidence, but as a distinct exception to the hearsay rule. The subject is fully reviewed in Jacobi v. State, 133 Ala., at p. 14, by Chief Justice McClellan, who quotes the neat phrase of Lord Justice Bowen: "The state of a man's mind is as much a fact as the state of his digestion," and may be proved by any declarations indicative of mental or bodily health or infirmity. The exception to the hearsay rule is admitted, we presume, because of (723) necessity in making proof of the fact and the difficulty of showing it otherwise, or because it may be considered as natural evidence, and reliable, if sincere and not feigned, of which the jury must judge. *Page 812 
If it should appear that the declarations are not genuinely expressive of the mental or physical condition, they would, of course, be disregarded.
The declarations must have been made at a time sufficiently close to the principal occurrence as to have some probative force in regard to the mental condition of the person who committed the act or whose sanity is in question.
There is some testimony in this case that the defendant had been having something like epileptic attacks and that he was subject to fits, which had weakened his faculties, and that just before he assaulted the woman with his gun and killed her he was not in his normal condition of mind, but was rather sullen and morose, acted "curiously," and was indifferent to his surroundings. There was also testimony, coming from his own witnesses, that after the intimacy between him and the woman had ceased, and they had stopped living together, he became silent, sullen, and indifferent, and that he killed her shortly after the two had fallen out with each other and just after the deceased had asked him why he did not go home.
One who is so insane as to be incapable of having a criminal intent, which is one of the essential ingredients of crime, is not, in law, responsible criminally for his acts, want of sufficient mental capacity to form such intent being a complete defense and not merely a mitigating circumstance; but in order to be available as a defense the insanity, or want of mental capacity, must exist at the time the act is committed. 12 Cyc., 164, 165. It is said at the latter page: "Where a person becomes insane after commission of a crime, he cannot be tried while in such condition, but such insanity does not exempt him from responsibility and prosecution if he afterward becomes same again. The former insanity of the accused does not excuse his crime if it appears that he recovered from it previously to the commission of the crime; but in the absence of such proof it will be presumed to be continuous to the time of the crime. The law does not require that the insanity shall have existed for any definite period, but only that it shall have existed at the precise moment when the act occurred with which the accused stands charged." Again, the insanity must render the person incapable of understanding the nature and quality of the act he is about to commit or of distinguishing between right and wrong, either generally or with reference to the particular act. 12 Cyc., 165. While a slight departure from a well balanced mind may be pronounced insanity in medical science, yet such a rule cannot be recognized in the administration of the law when a person is on trial for the commission of a high (724) crime. The just and necessary protection of society requires the recognition of a rule which demands a greater degree of insanity to exempt from punishment. 109 Pa. St., 262, 271. *Page 813 
The Court, in S. v. Brandon, 53 N.C. 463, 467, after referring to the defense set up by the prisoner in that case, that he was under the influence of a superior and irresistible moral power or supernatural force which destroyed his free agency, said: "It assumes that the accused knew the nature of his act, and that it was wrong. The law does not recognize any moral power compelling one to do what he knows is wrong. `To know the right and still the wrong pursue' proceeds from a perverse will brought about by the seductions of the evil one, but which, nevertheless, with the aids that lie within our reach, as we are taught to believe, may be resisted and overcome; otherwise it would not seem to be consistent with the principles of justice to punish any malefactor. There are many appetites and passions which by long indulgence acquire a mastery over men more or less strong. Some persons, indeed, deeming themselves incapable of exerting strength of will sufficient to arrest their rule, speak of them as irresistible, and impotently continue under their dominion; but the law is far from excusing criminal acts committed under the impulse of such passions. To excuse one from criminal responsibility the mind must, in the language of the judge below, be insane. The accused should be in such a state from mental disease as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong, and this should be clearly established. This test, a knowledge of right and wrong, has long been resorted to as a general criterion for deciding upon legal accountability, and, with a restricted application to the act then about to be committed, is approved by the highest authorities. But we do not undertake to lay down any rule of universal application."
The charge of the court upon this phase of the case — the insanity of the prisoner at the time he killed the woman — was clear and full, and conformed to the rule we have stated.
The prisoner excepted to an instruction of the court to the effect that if he had failed to satisfy the jury that he did not have mental capacity sufficient to commit a crime the verdict would be guilty, the particular objection being that the court should have said if he had failed to satisfy the jury "from the evidence" of his mental incapacity he should be convicted; but, in the sentence immediately preceding, the court had instructed the jury that "If the defendant has satisfied you from theevidence that he did not have sufficient mental capacity to commit a crime, he should be acquitted." The two instructions are so intimately connected with each other that no intelligent jury could have misunderstood what was meant, nor can we reasonably suppose that they would find the fact one way or the other without any evidence, or (725) otherwise than "from the evidence." The charge of the court *Page 814 
must be considered as a whole, in the same connected way as given to the jury, and upon the presumption that the jury did not overlook any portion of it. If, when so construed, it presents the law fairly and correctly to the jury, there is no ground for reversing the judgment, though some of the expressions, when standing alone, may be regarded as erroneous. Kornegay v.R. R., 154 N.C. 389; S. v. Robertson, 166 N.C. 356; S. v.Lance, 149 N.C. 551; McNeill v. R. R., 167 N.C. 390; Thompson on Trials, sec. 2407.
We believe that this covers all the exceptions taken at the trial to the rulings of the court and the charge, and in none of them do we find any ground for a reversal.
No error.
Cited: McCurry v. Purgason, 170 N.C. 467 (5g); S. v. Killian,173 N.C. 795 (5g); S. v. Orr, 175 N.C. 777 (5g); White v. Hines,182 N.C. 280 (2g); S. v. Hairston, 222 N.C. 461 (4g); S. v. Hairston,222 N.C. 462 (5g); S. v. Matthews, 226 N.C. 642 (4g); S. v. Swink,229 N.C. 125 (4g).