STATE v. VASQUEZ.

No. 6389.   Decided February 7, 1942.   (121 P. 2d 903.)

See 14 Am. Jur., 892; 22 C. J. S., Criminal Law, sec. 333.

*William J. O'Connor, Jr.*, and *LeGrand A. Carlston*, both of Salt Lake City, for appellant.

*Grover A. Giles*, Atty. Gen., *Zar E. Hayes*, Deputy Atty. Gen., and *Brigham E. Roberts*, Dist. Atty., of Salt Lake City, for respondent.

MOFFAT, Chief Justice.

On the first of September, 1940, Guadalupe Vasquez shot Juan Vargas. Both were Mexicans. The shooting from which Vargas died occurred at or near Fourth West and Second South streets, Salt Lake City, Utah.

About a month before the shooting Vargas and Vasquez had a fight in which Vargas beat and kicked Vasquez. Between the time of the fight and the fatal shooting, there was some evidence that Vargas had told others he was going to kill Vasquez. Upon this being reported to Vasquez, it is argued he said:

"All right, I will forget about it, if he will let me, but I cannot take another beating."

This quoted statement was excluded by the court. Physically it seems Vasquez was no match for Vargas, the latter being the larger, more vigorous and powerful of the two.

Witnesses who observed the tragedy, the position of the parties, and objects and conditions told the circumstances with varying details. Several witnesses testified that there was an ice pick by the side of Vargas where he fell when shot. One witness said that Vargas, after he was shot, said in Spanish to him,

"Louie please take that ice pick."

Several witnesses said they did not see an ice pick there. The witnesses who said they saw an ice pick were generally in a better position to say. The statement by others that they did not see an ice pick amounts to little as against the

testimony of those who did. Evidence concerning the presence of the ice pick by the body of Vargas at the time of the tragedy, and some other events, movements, and suggestions are suggested as tending to show that Vasquez might have been acting in self-defense. At least this was the theory of his defense.

The appeal raises no question as to the sufficiency of the evidence to support the verdict of the jury. It is therefore unnecessary to go into the details of the evidence, or the conflicts therein.

The points raised by the appeal go to the question ultimately as to whether the defendant was accorded a fair trial.

Some items require notice before we proceed to an examination of the points argued as errors that occurred in the trial.

The defendant was bound over to the district court. The information recites that the defendant, having been committed to answer the charge, was accused of the crime of murder in the first degree. The record showed that the defendant, at the time of the preliminary hearing, requested he be given "such information as he is entitled to under the Constitution of the State of Utah" and also that "the defendant be given the information that would sufficiently enable him to prepare his defense."

Defendant attempted to have the record of the committing magistrate corrected to show his demand for a bill of particulars in the proceedings before the committing magistrate. It does not appear that the record was corrected or completed, although affidavits of the committing magistrate and counsel for the defendant make it appear without contradiction that the record was incomplete. The motion to quash the complaint and the information were not specifically designated a "bill of particulars" but the motion raised the question as to whether the complaint fails to inform the defendant of the particulars of the offense sufficiently to enable him to prepare his defense or to give

him such information as he is entitled to under the Constitution of this state. Revised Statutes of Utah, 1933, 105-21-9, and 10, as amended by Chapter 118, Laws of Utah, 1935.

No point is made of these matters on this appeal. A defendant may waive his preliminary hearing and consent that he be bound over to the district court by the committing magistrate. We conclude that point was waived.

The sufficiency of the information was attacked in the district court by a motion to quash the information. The motion was denied. The court considered the motion as a demand for the bill of particulars. The court thereupon required the defendant to come forward and he was asked what his plea was to the information. The following is taken from the record:

### Mr. Carlston:

"If the court please, at this time, in view of the fact that we have been denied our constitutional rights to which we are entitled to (sic) and in view of the fact that we have been denied what we believe our statutory rights, the defendant respectfully declines to plead."

### The Court:

"You may be teaching the Bar and the court in this state a lot, but I think your attitude way beyond the responsibility that counsel have to their clients. I think it is capricious. I think it is hypercritical. I think it is arbitrary. I think it verges upon sharp practice, and you can put that in the record; I want the Supreme Court to see it."

A plea of not guilty on behalf of the defendant was entered by the court. The remarks of the court directed to counsel appear unnecessarily severe.

Before the first witness had proceeded far in his testimony, counsel for defendant announced to the court that defendant, who was a Mexican, could not hear all the witness said and was unable to understand some that he could hear. The defendant spoke Spanish, and what some wit-

nesses described as broken English. His counsel spoke English and did not understand Spanish. Counsel for defendant requested that an interpreter be sworn to interpret the testimony so defendant could understand. This the court refused.

The refusal of the court to grant defendant's request presents a question about which much might be said, yet there are few instances where a similar case has been reported. If the defendant cannot understand what the witness is relating, from some points of view it is analogous to his being out of hearing.

In the case of *State of Utah* v. *Mannion,* 19 Utah 505, 57 P. 542, 544, 45 L. R. A. 638, 75 Am. St. Rep. 753, a defendant was required by the court to take a seat in a part of the court room away from the jury and witness, where he could not hear what the witness tesified to, nor could he see the witness while she testified. The court held that in a criminal prosecution the accused has the right to appear and defend in person and by counsel and to be confronted by the witness against him.

"He had the right to see and be seen, hear and be heard, under such reasonable regulations as the law established[,] by our constitution" and went on to say the court "denied the defendant a constitutional right, and prevented him from having a fair trial."

"The constitutional right to be confronted by witnesses against him, and to defend in person, would be of little avail to the accused if he could be compelled to remain away during his trial, out of the sight and hearing of the witnesses against him."

We have authority for the position that the defendant has the right to see the witness testifying against him and to hear what the witness says. Are these rights more essential, or even as essential, than the right to understand what is going on in the proceeding? Suppose a defendant were placed in a transparent compartment where he could see all that took place, yet was deprived of hearing what was said because all sound was cut off, could it be said that such a situation were less than a deprivation of the consti-

tutional right of confrontation? The purpose of the confrontation must be to permit the defendant to be advised of the proceedings against him.

Degrees of understanding may present themselves between that of complete comprehension of the language to that of minor matters. The question, not properly heard or understood, may bring forth an answer that might turn the scales from innocence to guilt or from guilt to innocence. Then, too, the answer given might be made in words not entirely familiar or understood by the defendant. Mr. Justice Holmes once wrote:

"A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne* v. *Eisner*, 1918, 245 U. S. 418, at page 425, 38 S. Ct. 158, at page 159, 62 L. Ed. 372, L. R. A. 1918D, 254.

While English has comparatively few inflections, either a prefix or a suffix mistakenly applied or interpreted may change the meaning of a whole sentence. In this country the English language is the language of the courts. It may be argued that one who commits a crime in a given country should be required to provide himself with all the means that will enable him to understand the nature and cause of the accusation, and to present his defense. In answer thereto it might be said that the law has provided that where one is unable, because of impecuniosity to secure counsel, the court will appoint counsel for him. Although nominally prosecuting, the state is as interested in proving the innocence as the guilt of the party charged.

In order that a proceeding may be conducted in English and fulfill in part the requirements of a fair trial, Section 20-7-23 and Section 105-46-7, Revised Statutes of Utah, 1933, provide:

"Every written proceeding in a court of justice shall be in the English language, and judicial proceedings shall be conducted, preserved and published in no other." And "The court or magistrate may cause to be issued a subpoena requiring any competent person to ap-

pear before the court at or during a trial or proceeding and act as interpreter.  *  *  *"

If a witness cannot speak English, an interpreter must be provided.

"An interpreter is a witness subject to all of the rules relating to witnesses."

(Code of Evidence proposed by the American Law Institute.) So where a witness cannot make himself understood wihout a ninterpreter, it requires both the witnes sand interpreter in order that counsel, the court, the jury and defendant will be brought as nearly a fair and complete understanding as may be reasonably possible. ·

Evidence that the court or jury may not hear or understand is valueless in the settling of the issues. A witness fluently giving a narrative, understood by him but not by the court or jury, may, so far as reaching a comprehensive result is concerned, be telling of the gold, gum, salt, and ivory of Timbucktu. May it be said to be a fair trial if a defendant is in the same position?

In the instant case, the defendant demanded an interpreter upon the ground he was not able to understand all the English-speaking witness said. The trial court said the defendant could not have an interpreter upon the ground it was "a right the defendant isn't entitled to in an English speaking court."

Section 12, Article I, Constitution of the State of Utah, provides, in part:

"In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to be confronted by the witnesses against him."

As has heretofore been stated, the right of confrontation, in a constitutional or bill of rights sense, is more than the

dictionary definition, viz., to meet face to face. A trial is more than a meeting of a defendant by witnesses face to face and silently. The confrontation is the meeting of the proof or evidence as understood by the interested parties according to their understanding.

It is important that the trial court in the exercise of its discretion as to the necessity of an interpreter, either for the defendant or for a witness, be fully advised. It is far better to err by traveling a longer road or taking more time than to err by depriving one of a fair trial for want of understanding or comprehension of what is taking place. This is especially so where a human life is at stake. The purpose of a criminal proceeding is not to convict but to determine innocence or guilt. Such having once been determined by a fair trial, what follows is an administrative matter.

We concur in the statement in the case of *Escobar* v. *State*, 30 Ariz. 159, 245 P. 356, and cases therein cited, to the effect that

"it is the fairer and better way for the court, either of its own motion in a capital case or upon request in one of a lesser degree, to provide such an interpreter, and, if in any such case, the record indicates a failure to provide an interpreter has in any manner hampered the defendant in presenting his case to the jury, we shall hold a fair and impartial trial has been denied him."

What has been said covers another problem in the case. The defendant offered himself as a witness in his own behalf. The following occurred:

Mr. Carlston:

"I request that he be sworn in his native tongue, the Spanish language, because he has difficulty understanding English."

The Court:

"We will swear him in his native tongue, but we will try to get along without an interpreter."

After defendant was sworn, his counsel then requested that the defendant be permitted to speak in his native tongue through an interpreter. This was objected to on behalf of the state. The court then refused or failed to rule upon the question that had been asked and objected to, to wit: "Do you have difficulty in understanding all that is said to you in English" without the defendant giving the court an opportunity to judge whether an interpreter was necessary. this was error.

The defendant excepted to an instruction given by the court, part of the instruction reads:

"You are further instructed that if you find the defendant guilty of murder in the first degree, you should then consider the question of making such recommendation [that is life imprisonment] and in considering this question you are to give it your careful and conscientious consideration. You should take into consideration all of the facts and circumstances shown by the evidence in the case surrounding the fatal shooting which would appeal to your judgment as reasonable men and from all of these facts and circumstances determine whether or not you will make such recommendation. If you make such recommendation you will include it in your verdict."

This instruction was erroneous. In this jurisdiction the question as to whether the jury shall recommend the defendant to the mercy of the court is a matter entirely within the jury's discretion. *State* v. *Markham*, 100 Utah 226, 112 P. 2d 496. The Markham case and the cases therein cited need not be amplified. It is sufficient to say that the instruction could have no other purpose than to guide the jury as to the verdict they should render.

Other assignments are made, among them, that the defendant's theory of the case should be included in the court's instructions to the jury. It would unnecessarily lengthen this discussion to quote the instructions requested and those given and compare them. The instructions are subject to the criticism that they are largely correct abstract statements of the law with insufficient application of the proven facts and theories of the case to the law as stated.

We are of the opinion that the cumulative effect of the errors amounted to the denial of a fair trial. The judgment is reversed and the cause is remanded for a new trial.

LARSON, J., concurs.

WOLFE, Justice (concurring in the result).

The Court's opinion unwittingly gives the impression that Vasquez was purely on the defense when he shot Vargas; that Vargas was after Vasquez with an ice pick because there was evidence that one was near Vargas when he fell although evidence of this is in dispute. This partial recital of the facts gives a wrong impression of the whole picture. It appears from the evidence that on the night of the tragedy one Maximo Ruiz, a roommate of Vasquez, and the latter left their home with the intention of going to a picture show. Vasquez paused to talk with a neighbor and Ruiz walked ahead on Woodbine Avenue to Second South Street, waited there, then proceeded by himself east to the Corona Cafe located at 528 West Second South Street where Vargas called to him. A few moments later Vasquez proceeded out of Woodbine Avenue, thence east on Second South and as he passed the Corona Cafe looked in the window, stopped, turned around, walked west on Second South and back again to Woodbine Avenue. Within a short time Vasquez was again seen coming out of Woodbine Avenue. He then went west on the north side of Second South, crossed to the south side of the street, walked east to Fourth West where he again crossed Second South to the north side of the street, nearly completing a rectangle. On the northwest corner he talked with Perfecto Ruiz for at least ten minutes. About that time Vargas and his two friends came out of the cafe and proceeded east along Second South Street. Vargas offered his friends cigars, lit one himself and started to smoke it. As they then approached Fourth West Street, Vasquez started west to meet them. When Vargas saw Vasquez, he Vargas, started to jump behind a tree and as

he did so Vasquez shot twice. One of the bullets took effect and Vargas fell to the sidewalk and started to crawl toward Vasquez. Vasquez then walked—the evidence says laughingly up to Vargas and shot the gun three more times. He then grabbed hold of Vargas' hair, pulled his head up and placed the gun against it and pulled the trigger but the gun had been emptied. Under these facts the jury may well have come to the conclusion that Vasquez deliberately sought Vargas out in order to kill him; that he went back for a gun for that purpose. The testimony in regard to Vargas having an ice pick (itself in conflict) might have seemed to the jury to make out a poor case of self-defense for Vasquez under the circumstances mentioned.

I have set out the evidence of the movements of Vasquez because the opinion of the court seemingly gives the impression that Vargas was about to attack Vasquez and the latter was defending himself. I think the more complete picture should be portrayed.

The court did not err in refusing to furnish defendant an interpreter so that he could understand the witnesses testifying in English. There was no showing that the defendant could not provide himself with such facilities. The court will furnish counsel for an impecunious defendant in a criminal case; also if it is shown that defendant cannot understand the language in which the testimony is given and knows no friend who could interpret between him and the witness or between him and his counsel in the court room, such facility might well be provided at the expense of the State. But if there is a duty on the part of the court to do so, and I am by no means convinced that there is, certainly such duty depends on a proper showing. This is not a case in which the defendant was defending per se. He had counsel who understood the language of the witnesses and cross-examined them. The court took no antagonistic attitude toward the defendant providing himself with an interpreter—in fact, suggested that there was "no objection to the defendant, if he has friends that can speak En-

glish and can speak Spanish, sitting near him and assisting him in every way possible."

I think no constitutional right was violated in refusing the defendant a private interpreter.

As to the right of defendant to testify in his own language: The defendant's attorney requested that his client be permitted to testify in his native tongue. The prosecution resisted until there was a show of necessity. The court observed that there was some evidence in the record that defendant had answered questions put to him in English and that "I think we ought to make an attempt to see if he can speak and understand English." To this counsel for defendant remarked: "I have used an interpreter when I talked to Mr. Vasquez about important matters and I have found he does not understand me fully and there are many times he does not understand," to which the Court rejoined, "The Court does not have to take your word for that." Counsel asked for a ruling but the court refused to rule at that time desiring to ascertain by a demonstration whether the defendant could sufficiently understand and answer. Counsel for the defendant then asked the witness whether he had "difficulty in understanding all that is said to you in English." An objection was interposed wherefore the court stated "I am going to decide that, not him." Counsel for the defendant then stated "inasmuch as the court won't rule on that request for an interpreter, I will withdraw the defendant from the stand, and the defendant rests his case."

I cannot see error in the court's action. While a defendant is entitled to an interpreter where he cannot adequately express himself the jury is also entitled to have the benefit of his testimony directly if it can be conveyed to them in English. All of us who have sat as trial judges know that there have been times when witnesses who are familiar with a foreign tongue have sought to testify through interpreters because it has enable them to fashion a story with a facility impossible if their testimony must be expressed in the sim-

ple English terms with which they are familiar. Certainly the reaction of the witness, his demeanor on the stand is much more discernable to the juror when questions and answers are framed in English. And the intelligent judge and juror does not have much difficulty in determining after a short period whether the continuance of the attempt to convey the witness's impressions in English are fruitful or whether he is pretending or honestly having difficulty. This in itself is a valuable index to demeanor. The court certainly was entitled to ascertain through its own observation the ability or inability of the witness to carry on in English.

Instruction No. 9 admonished the jury to

"take into consideration all of the facts and circumstances shown by the evidence in the case *surrounding the fatal shooting* which would appeal to your judgment as reasonable men and from these facts or circumstances determine whether or not you will make such recommendation." (Italics added.)

It is true that the jury has unlimited discretion to make the recommendation. Admiration for some quality displayed by the defendant in the court room, sympathy for his family or even a satisfaction in his sartorial attire could be the basis of the recommendation but we think of the discretion as being based on reason and on some extenuating fact or circumstances of the case which moves the reason and not on capriciousness. While I think the language of the Instruction may have been susceptible of the interpretation that the discretion *must* be based on circumstances or facts surrounding the fatal shooting, certainly if we gave the phrase "surrounding the fatal shooting" the scope which it is naturally susceptible, i. e., leading up to and attending the shooting and following the shooting, it could have done no harm for such is what the jury should in reason have taken into consideration as the basis for a recommendation. There certainly is not the slightest ground for thinking that a jury otherwise ready to recommend life was constrained not to do so by this instruction.

Complaint is made that the court instructed as to when malice is presumed when there was no presumption (Instruction No. 15) in the case. True, the instruction is introduced with a statement of a situation in which malice is presumed because of the manner and state of mind in which the killing was accomplished and then goes on to say that since the facts and circumstances attending the killing were shown, the question of malice was to be determined as a matter of fact and not upon a presumption. While giving to the jury the law as to when malice is to be presumed was unnecessary, certainly the remainder of the instruction was most clear and definitely showed that presumption had no application. Some latitude by the way of introduction and rounding out must be allowed the Court. Nothing in this instruction was prejudicial.

Instruction No. 6 recited the nature of acts by which murder in the first degree could be committed. It was in the abstract and while the entire statute was not applicable to the facts of this case no possible prejudice could have resulted in the light of the evidence which definitely excluded a killing not specifically intended. Likewise, Instruction No. 8 defines as one of the necessary elements the intentional killing of Vargas or death of Vargas by the intention to "effect the death of any other human being other than the one who was killed." The quoted portion was so obviously not applicable to the facts that the jury could not by any stretch of the imagination have applied it to the case. The evidence set out hereunder shows an intention to kill Vargas and Vargas alone. The evidence could not possibly have been given any other meaning. There was no prejudicial error in these instructions.

The most serious question presented for our decision is whether the defendant was entitled to introduce his own statements as to his attitude toward the deceased. The evidence tendered but rejected was as follows:

"This witness will testify that Guadalupe Vasquez, at the time and that place said that through certain people he had heard that Juan Vargas was in town and was looking for Vasquez, and was going to get Vasquez. * * * And he had heard this from other people. And then the witness will testify that he discussed those reports with Mr. Vasquez, and the witness will then continue to testify that he advised Mr. Vasquez to pay no attention to those threats he had heard about, and that it was best to forget about it. The witness will further testify that Mr. Vasquez said "All right, I will forget about if he will let me, but I cannot take another beating."

This evidence was not admissible under the res gestae rule. Should it have been admitted under any other rule? The theory on which this was proffered was that it tended to show the absence of ill will on part of defendant toward deceased and hence tended to negative that defendant had been the aggressor. Defendant relies heavily on Dean Wigmore's opinion that such statements should be admissible on the theory that if defendant's statements showing ill will are admissible, his statements showing good will should likewise be admissible. I cannot subscribe to Dean Wigmore's proposition in its full scope. Self-defense is one of the easiest of concocted defenses in certain sorts of killings where there has been a previous quarrel. One who has designs on the life of an alleged enemy would be quite apt to build a defense if the law permitted his statements previous to the killing to strengthen that defense. Such was the opinion of the Court in *Bryce* v. *State,* 167 Miss. 255, 148 So. 348; *Woods* v. *State,* 115 Tex. Cr. R. 373, 28 S. W. 2d 554; *State* v. *Davis,* 30 N. M. 395, 234 P. 311, where the accused went to the authorities and stated that he was fearful of deceased and needed protection or would protect himself. In these cases the statements of accused were initiated purely by him. The cases of *Birdsong* v. *State,* 47 Ala. 68, and *Russell* v. *State,* 119 Tex. Cr. R. 469, 45 S. W. 2d 622; *Fleenor* v. *Commonwealth,* 255 Ky. 526, 75 S. W. 2d 1, show situations where the statements of accused were not initiated by him but naturally flowed out of or were responsive to circumstances or conversation which elicited his statement.

Statements so made would ordinarily be guaranteed against contrivance and intent to manufacture a defense in advance. The failure of the cases to make this distinction arises largely out of the judicial tendency to fit all situations into a fixed conceptual framework. Thus, a statement made by a defendant which serves him is self-serving. But there are exceptions to the general rule that statements made by persons which ultimately enure to their benefit are self-serving. I see no objection to extending those exceptions where the statements are attended by sufficient guarantees against their utterance for premeditated future use.

The testimony of Perfecto Ruiz tendered was of this class. While the conversation may have been begun by the defendant, his material statement was a response naturally elicited by Ruiz's admonition to "forget about it." It should have been admitted. The first portion shows the circumstances out of which the statement of the defendant's willingness to "forget" arose and the last portion the statement itself. Having the view of the matter just indicated, it becomes unnecessary to consider the question of whether a third party's testimony of defendant's extrajudicial statement that he had heard that Vargas had threatened him was admissible to prove a communication of threat, whether such statement was true or false. It might be noted that under Chapter 7 of Code of Evidence (Tentative Draft No. 2) of the American Law Institute, Ruiz's statement would have been admissible, even though hearsay. Nor is it necessary to consider the Utah cases of State v. Coyle, 41 Utah 320, 126 P. 305, and State v. Allen, 56 Utah 37, 189 P. 84, which appear to present situations where the statements of the defendants admitted to show a state of mind favorable to their defense were prompted by extraneous stimulation which furnished the guarantee against any intent to manufacture evidence.

I am not sure that the refusal to admit the statement of Ruiz is prejudicial error. It may well be that the jury would, in view of the facts, have still concluded that the defendant

entertained a vicious attitude toward Vargas and sought to give it vent. There was evidence that at their first quarrel Vasquez, after an insulting remark to Vargas which provoked Vargas to start after him, drew a knife which stopped Vargas in his pursuit with the remark, "you win." After this Vasquaz in apparent friendliness brought over to Vargas the latter's unfinished bottle of beer and when Vargas reached for it, Vasquez hit him over the head with the bottle wherefor Vargas "beat up Vasquez." This was the quarrel that lead to the shooting. It reveals Vasquez as provocative and underhanded, and Vargas as one not seeking but not running away from a quarrel. Certainly under all the evidence of this case I am quite doubtful whether, if the evidence of Ruiz had been admitted, the result would have been any different. The conclusion of the majority seems to have been influenced by what it deemed the antagonistic attitude of the trial judge; that he was short and curt with defendant's counsel and that this carried over to the jury. Otherwise I see no reason for introducing into the opinion what transpired between court and counsel at the time of arraignment. The general attitude of a trial judge may be so hostile as to influence the jury and result in denial of a fair trial but if so, sufficient evidence of that should be pointed out from the record. The trial judge may not have been so dour in this case as the cold record may seem to indicate. Perhaps we should accord to him the benefit of expressions, tone of voice and inflections that may soften the apparent abruptness of expression when transmitted in cold print. Having, however, some doubt as to whether the failure to admit the testimony of Ruiz might not have been prejudicial. I shall vote with the majority for reversal. I therefore concur in the result.

McDONOUGH, Justice (concurring).

I concur in the order reversing the judgment and remanding the case for a new trial. I do so on the ground that the cumulative effect of the errors committed resulted in prej-

udice. No question is raised as to the sufficiency of the evidence to justify the verdict, nor upon the record could such contention be sustained.

I am of the opinion, however, that no error was committed by the court in not providing an interpreter for defendant when he took the witness stand. The court had no evidence before it upon which to base a decision as to whether an interpreter should be furnished, and hence did not rule on the matter. True, the court, in response to an objection interposed by the State to the question addressed to defendant by his counsel, to wit: "Do you have difficulty in understanding all that is said to you in English?" said, "I am going to decide that, not him." Nevertheless, the court's last expression on the matter was, "I am neither denying you the right for [to] an interpreter in this case, nor am I granting it until you, yourself, and the defendant give the court an opportunity to be the judge as to whether or not it is necessary that we need an interpreter in this case. That is a discretionary matter with the court, in my opinion."

The defendant thereupon rested his case without testifying. No opportunity was afforded the court to determine whether or not the defendant had sufficient command of English to tell his story clearly to the jury. The court should, of course, have permitted the defendant to answer the question asked by his counsel relative to his understanding of English. Had his answer been in the affirmative it might well have resolved the question. Had it been in the negative, it would not have precluded the court from making further examination as to his ability in the respect inquired about.

As the record stands, this court could not, any more than the trial court, make a finding that the defendant does not have such a command of the English language that he should be permitted to testify through an interpreter.

The same is to a certain extent true of his counsel's request at the outset that the testimony of the witnesses be interpreted to defendant. There was before the court only

counsel's statement that defendant "could not understand all the English that is being said, and he is handicapped." I am of the opinion that the court should have at that point invited inquiry or have made such into the defendant's ability to understand English-speaking witnesses. This, because I am not at this time prepared to say that should it appear that a defendant charged with a felony—and especially if it be a capital offense—is unable to understand the language of the forum, it is not the duty of the court to have the testimony interpreted to him —whether or not he be impecunious. That such is the court's duty seems to be rule in England. *Rex* v. *Lee Kun,* [1916] 1 K. B. 337, 9 B. R. C. 1121, cited by appellant, wherein the reasons upon which are based such duty of the sovereign are discussed by Lord Reading. Whether such rule or that requiring a showing of financial and other inability to secure the services of an interpreter be the rule in this jurisdiction, the showing requisite to invoke either is absent from the record. Defendant's counsel should have made a record or proffered proof of his assertions as to defendant's handicap, rather than exhibit petulance at any adverse ruling or demurrer to his suggestions by the court.

Nevertheless the court should have, in my opinion, invited an inquiry into the suggested handicap of defendant before proceeding.

At to the rejection of the evidence discussed in the opinion of Mr. Justice Wolfe, this was error. 6 Wigmore on Evidence, 3rd Ed., Sec. 1732. Whether such evidence was concocted or made prior to the crime for the purpose of exoneration are matters which would in most cases be divined by the jury in the light of the surrounding circumstances. I do not think, however, in view of all the evidence relative to the relations between the accused and deceased that the rejection of such evidence would justify reversal of the judgment. Yet examination of the whole proceedings creates such a substantial doubt in my

mind as to defendant's having had a fair trial as to amount to a conviction that defendant was prejudiced.

PRATT, Justice (concurring).

I concur for the reasons given by Mr. Justice McDON-OUGH.