STATE v. MASATO KARUMAI.

No. 4449.   Decided June 11, 1942.   (126 P. 2d 1047.)

See 14 Am. Jur., 892; 20 Am. Jur., 433, 474; 23 C. J. S., Criminal Law, sec. 999.

*Burton W. Musser* and *Herbert Van Dam, Jr.,* both of Salt Lake City, for appellant.

*Grover A. Giles,* Atty. Gen., and *A. John Brennan* and *Herbert F. Smart,* Deputy Attys. Gen., for respondent.

WADE, District Judge.

On March 1, 1925, the defendant Masato Karumai, shot and killed one Yosaki Ishisaka in a back room of a Japanese Social Club operated by defendant's friend, one Honda, in Helper, Utah. A number of Japanese had gathered in the Club and had been playing a gambling game with buttons called Chico or Fan-Tan. Two Chinamen were operating the game, one dividing the buttons among the players and the other collecting the money. Ishisaka was one of the players, and a quarrel arose between him and the Chinaman who divided the buttons. Ishisaka was a large man; he accused the Chinaman of crookedness in dividing the buttons and demanded they be divided over again. This the Chinaman refused to do, and Ishisaka pounded the table with his fists, scattered the buttons, and fighting words passed between the two, causing confusion and loud noises.

Ishisaka and the Chinaman faced each other—apparently to fight.

At this point there is a dispute in the evidence. The defendant, who was partially corroborated by Honda, claims that, to prevent a fight, he approached Ishisaka and took hold of his arm, whereupon Ishisaka kicked him violently in the groin, knocking him to the floor, causing severe pain, and saying, "I'll kill you." While defendant was thus on the floor, Honda—the proprietor—having heard the noise, entered the room and took Ishisaka by the arm and, as he turned away from the defendant, the defendant drew his gun and shot Ishisaka twice in the back of the neck and head. Ishisaka fell dead instantly.

This testimony was controverted by five Japanese witnesses called by the State. Four of the witnesses were in the room during the entire time—could see all that happened—and all of them saw the shooting. They testified that the defendant was not playing in the game and took no part in the quarrel, and that no words were directed toward him during the quarrel. They further testified that he was not kicked or knocked down but that when Honda came in and took hold of Ishisaka's arm (as Ishisaka and the Chinaman were ready to fight) the defendant—who was a mere spectator—drew his gun and shot Ishisaka without provocation.

Defendant's attorneys contend that defendant was unable to speak or to understand English and, since the trial was conducted in English and was not translated for him into his own language, he was denied the right of being confronted by the witnesses against him and the right of being present at the trial, and thus he had no preliminary hearing. Defendant did not waive a preliminary hearing and defendant's attorneys contend, therefore, that these proceedings did not constitute due process of law, and resulted in grave injustice. In order to understand just what happened it is necessary to make a detailed statement of the facts on this point.

A complaint was filed in the Justice's Court, charging the defendant and Honda jointly with murder in the first degree. When defendant was brought before the Justice on March 5, 1925, for arraignment, the complaint was read to him through an interpreter and he was informed—through an interpreter—of his right to counsel at every stage of the proceedings. At the preliminary hearing on March 17, 1925, the defendant and Honda appeared without counsel and demanded and were granted separate hearings. The defendant's preliminary hearing was held on that day. An interpreter translated the testimony of five Japanese witnesses, all eyewitnesses to the killing, but did not translate to defendant the testimony of the doctor or the sheriff, both of whom spoke in English. Such testimony was merely a description of the body when found, of the wounds thereon, and the cause of death. The defendant being bound over to the District Court, an information was filed charging him with murder in the first degree. M. P. Braffet appeared as defendant's attorney and by court order a transcript of the testimony at the preliminary hearing was made for him at the State's expense. At the first trial—commencing September 15, 1925—the jury failed to agree. On January 6, 1926, the Court appointed George J. Constantine to represent defendant at the next trial, and by Court order the testimony of the first trial was transcribed for defendant at the State's expense. The second trial commenced on January 25, 1926; the defendant appeared with his attorney and an interpreter was later subpoenaed at the defendant's request and at the State's expense. The jury was examined, the information was read, the opening statement of the District Attorney was made and three witnesses testified in English but none of this was translated to the defendant by an official interpreter. The State then called five Japanese witnesses and both the interpreter for the State and the defendant's interpreter were sworn to translate this testimony into English. The interpreter produced by the State did all the actual translating

of the testimony of all the Japanese witnesses throughout the trial, but the defendant's interpreter remained through-out the trial and assisted and made suggestions to the defendant and his counsel.

This second trial resulted in a verdict of guilty of murder in the first degree, without recommendation, and defendant was sentenced to be executed. It is from this verdict that the defendant appealed to this Court. Before the appeal was perfected, the defendant's attorney withdrew and George E. Marshell appeared as defendant's attorney. But before the hearing in this Court, the defendant was adjudged insane and was committed to the Utah State Hospital. In 1934, he was discharged from that Institution and returned to the Utah State Prison, where he is now incarcerated. On August 6, 1941, this Court appointed Herbert Van Dam, Jr. and Burton W. Musser to represent defendant.

This brings us to the consideration of defendant's assignments of error based on the fact that the testimony of the English-speaking witnesses was not translated into Japanese. No request of the defendant for an interpreter was denied, and at each hearing the Court had an interpreter there and at the last trial the defendant had, in addition, his own interpreter to assist him and his counsel. The defendant was furnished—at the State's expense—transcripts of the testimony at the preliminary hearing and at both trials. Three different attorneys have represented the defendant prior to this appeal. Though these attorneys knew the defendant's ability—or lack of it—to speak and understand English, they made no complaint that the proceeding in English were not translated to him.

There is no direct testimony concerning defendant's ability to understand English and little concerning his ability to speak it. A person may understand much more than he speaks and may wish an interpreter when testifying, even though one is not necessary. The evidence tends to show that defendant had lived in America at least 18 years and

part of that time he operated a restaurant in Nebraska. Deputy Sheriff Garrett testified that defendant answered his questions in English without hesitation, and Dr. Jones testified that defendant explained his physical condition in English. When on the witness stand, the defendant gave a different version of these conversations but he at no time made claim that he did not understand what was said. The record does not disclose that the defendant was so unable to understand the English language that he was thereby materially affected in any of the proceedings in this case in making his defense. All of defendant's arguments based on such a premise must therefore fail. *State* v. *Vasquez*, 101 Utah 444, 121 P. 2d 903; *Gonzales* v. *People of Virgin Islands*, 3 Cir., 109 F. 2d 215. The latter case also holds that failure to make timely objection waives the right to be confronted by the adverse witnesses.

To the ffect that failure to furnish an interpreter does not violate defendant's constitutional right to be confronted by witnesses, see *Zunago* v. *State*, 63 Tex. Cr. R. 57, 138 S. W. 713, Ann. Cas. 1913D, 665; *King* v. *Ah Har et al.*, 7 Hawaii 319; *Republic of Hawaii* v. *Yamane*, 12 Hawaii 189; *Escobar* v. *State*, 30 Ariz. 159, 245 P. 356.

Even though the Court erred in not furnishing an interpreter, the case will not be reversed unless it is shown that the defendant was prejudicied thereby in his defense. *Rex* v. *Lee Kun*, 1 K. B. 337, 9 Br. Rul. Cases 1121; *Escobar* v. *State*, supra.

In *State* v. *Vasquez*, supra [121 P. 2d 908], Justice Wolfe said:

"If it is shown that defendant cannot understand the language in which the testimony is given and knows no friend who would interpret between him and the witness or between hm and his counsel in the court room, such facility might well be provided at the expense of the State."

In the instant case the suggestion of Justice Wolfe that the defendant might have a friend to interpret for him was

evidently carried out to the satisfaction of all parties. There was no obligation—under the facts in this case—on the Court to do more.

In this type of case there is a serious possibility of grave injustice being done an accused by reason of his being unable to properly present his defense due to his inability to speak or understand the language in which the trial is conducted. Thus it is the duty of the Court to take whatever steps are necessary to prevent injustice and, if necesary, the Court should, on its own motion, appoint an interpreter for the defendant at the State's expense. All of the opinions in *State* v. *Vasquez*, supra, are to this effect and particularly relevent is the opinion of Chief Justice Moffat in which he quotes from *Escobar* v. *State*, supra. See, also, *Rex* v. *Lee Kun*, supra.

Defendant assigns as further eror that the evidence is insufficient to justify the verdict of first degree murder because—he contends—there was a quarrel in which the deceased was the aggressor and appeared about to fight and that the killing by the defendant, an onlooker not engaged in the fight, does not show premeditation, deliberation and malice aforethought but shows that the killing was the result of confusion and excitement and the excitable nature of the Japanese race, and therefore could not be more than voluntary manslaughter. He admits that killing with a dangerous instrumentality raises a presumption of malice aforethought, but claims this presumption is not supported by the evidence in the instant case and disappears when, as here, the circumstances are shown.

Malice and premeditation may not be presumed from the use of a gun when the facts and circumstances to the contrary are shown, but the facts and circumstances by their very nature may show premeditation, deliberation and malice aforethought. If the jury had found that the defendant was kicked and knocked down and that the deceased had threatened to kill him, there would be great weight to

defendant's argument that the killing was on a sudden quarrel and done in the heat of passion, but evidently the jury did not so find. There was ample evidence from which the jury might have found that the defendant was a mere bystander—that the deceased and the Chinaman engaged in a boisterous quarrel and appeared about to fight when the proprietor came in and attempted to stop them; that the defendant was not kicked or struck or molested by either word or act, and that he drew a gun which he was carrying and had loaded and took sufficient aim to shoot deceased twice in the back of the neck. Such circumstances do not indicate a person motivated by the heat of passion or a sudden quarrel but, by their very nature, tend to show deliberation, premeditation and malice aforethought.

This Court has repeatedly held that premeditation and deliberation may occur ony an instant before the criminal act is committed. All that is necessary is that the design to kill must be formed before the act. *State* v. *Morgan*, 22 Utah 162, 61 P. 527; *State* v. *Anselmo*, 46 Utah 137, 148 P. 1071; The Revised Statutes of Utah, 1933, provide:

103-28-2. Malice Defined.

"Such malice may be expressed or implied. It is express when there is manifested a deliberate intention unlawfully to take the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

Under this statute, the facts in the instant case probably show express malice and certainly show implied malice.

Defendant assigns as error the fact that certain conversations between defendant and the arresting officers were admitted in evidence, which testimony was inadmissible— according to defendant—because defendant had not been advised of his constitutional rights and was under arrest. The Deputy Sheriff testified, without objection, that on the night of the killing, after he had arrested the defendant and while taking him to the scene of the shoot-

ing he asked him why he killed Ishisaka and the defendant answered, "He was no good." Thereupon the defendant's counsel developed the fact that at that time the witness did not warn the defendant that what he said might be used against him. Defendant's counsel moved that the testimony be stricken but the motion was denied.

Later the same witness testified that after the preliminary hearing, when he returned the defendant to jail, he asked him "where he had trouble with Ishisaka" and that defendant replied, "About 18 years ago in Wyoming." The witness further testified that previous to the latter conversation he told defendant that what he said might be used against him, but stated that he could not be positive whether the defendant understood him or not. He testified, however, that the defendant did not display any hesitancy in replying to his questions. On neither occasion were any further questions asked to determine whether these statements were voluntarily made, and defendant has introduced no evidence to the contrary. On the witness stand defendant testified that he hold the Deputy Sheriff on these occasions that he did not kill Ishisaka, but defendant at no time claimed his statements were involuntarily made.

Defendant contends that the admission of these statements in evidence was error; that before a confession is admissible in evidence the State must make a preliminary showing that the statements were voluntarily made. *State* v. *Wells*, 35 Utah 400, 100 P. 681; 136 Am. St. Rep. 1059, 19 Ann. Cas. 631; *State* v. *Dunkley*, 85 Utah 546, 39 P. 2d 1097. Under the rule set out in these cases, and—even admitting that the statement involved was a confession and not merely an admission—the State made sufficient preliminary showing that the second statement was voluntarily made.

A confession is the admission of guilt by the defendant of all the necessary elements of the crime of which he is charged, including the necessary acts and intent. An admission merely admits some fact which connects or tends to connect the defendant with the offense but not with all the elements of the crime. *State* v. *John-*

*son,* 95 Utah 572, 83 P. 2d 1010; *People* v. *Fowler,* 178 Cal. 657, 174 P. 892; *State* v. *Carroll,* 52 Wyo. 29, 69 P. 2d 542. *State* v. *Stevens,* 60 Mont. 390, 199 P. 256.

Although there are some cases to the contrary, the great weight of authority and the better-reasoned cases hold that before receiving an admission—as distinguished from a confession—in evidence, it is not necessary that a preliminary showing be made to the effect that the ■ statement was voluntary. *People* v. *West,* 34 Cal. App. 2d 55, 93 P. 2d 153; *People* v. *Tuttle,* 27 Cal. App. 2d 647, 81 P. 2d 571; *People* v. *Fowler,* 178 Cal. 657, 174 P. 892; *State* v. *Stevens,* supra; *O'Loughlin* v. *People,* 90 Colo. 368, 10 P. 2d 543, 82 A. L. R. 622; 20 Am. Juris. 474, "Evidence," § 560.

In the statement testified to there was no express admission of the guilt of any crime of which defendant was charged. Construed against defendant in its strongest possible light, it was, at most, merely an admission that the defendant killed the deceased because deceased ■ was no good. On the other hand, it might well be taken to mean that the defendant merely asserted that the deceased was no good, without admitting the killing or offering a reason therefor. Even if taken as an admission that the defendant killed the deceased because deceased was no good, this does not admit that the killing was done with a criminal intent. The reason in the defendant's mind which caused him to make the assertion that the deceased was no good may have been the fact that the deceased had committed acts of aggression against the defendant which made it necessary for him to kill the deceased in order to defend himself. Thus, under these circumstances this was not a confession of guilt, but at most merely an admission of the act of killing. Therefore, no preliminary showing of voluntariness was necessary before admitting this evidence.

But even assuming this statement were a confession and not merely an admission—as above concluded—still there

was no showing that it was involuntarily made. The fact that the statement was made to an officer while under arrest does not make it involuntary. *People* v. *Parker,* 119 Cal. App. 246, 6 P. 2d 82; *State* v. *Ellington,* 4 Idaho 529, 43 P. 60; 20 Am. Juris. 433, "Evidence," § 500. Nor is the fact that no warning was given defendant that what he said might be used against him conclusive, but all these facts and the circumstances existing at the time should be considered in determining the voluntary or involuntary character of the statement. *State* v. *Cooper,* 170 N. C. 719, 87 S. E. 50, 8 A. L. R. 1214; *Coil* v. *State,* 62 Neb. 15, 86 N. W. 925; *State* v. *Howard,* 92 N. C. 722, 18 L. R. A., N. S., 791; 50 L. R. A., N. S., 1083. The court, therefore, did not err in receiving this testimony in evidence.

No error was committed in admitting the questions asked defendant by the District Attorney on cross-examination. If made in good faith, all these questions were proper, including the ones excluded by the Court. Although the State did not, in every instance, produce impeaching evidence to controvert defendant's denials, that does not necessarily show bad faith. In any event, the questions were not of such a nature that they would materially affect the defendant's case.

There was no error in the instructions given. Counsel does not contend that any instruction was an incorrect statement of the law, but argues that certain points were overemphasized, and others not stressed enough. Counsel further contends that the court should have applied the law more to the facts as shown in this case, instead of using general statements of the law and allowing the jury to make the application to the facts. It is the duty of the Court, where possible, to apply the law to the facts in the case, and leave to the jury only the determination of what the facts are. But the court did not commit error in instructing as it did.

The judgment of the trial court is therefore affirmed.

MOFFAT, C. J., and WOLFE, LARSON, and McDON-OUGH, JJ., concur.

PRATT, J., on leave of absence.