2007 UT 59

**STATE of Utah, Plaintiff and Appellee,**

v.

**Felipe SANTANA–RUIZ, Defendant and Appellant.**

**No. 20050747.**

Supreme Court of Utah.

Aug. 10, 2007.

Rehearing Denied Aug. 8, 2007.

---

**70.** *See id.* §§ 10–2–502.5, 10–9a–801.

Mark L. Shurtleff, Att'y Gen., Jeanne B. Inouye, Asst. Att'y Gen., Salt Lake City, L. Dean Saunders, Ogden, for plaintiff.

Sharon S. Sipes, Ogden, for defendant.

NEHRING, Justice:

## INTRODUCTION

¶ 1 Felipe Santana–Ruiz [1] was convicted of murdering Troy Florez. Mr. Santana–Ruiz and Mr. Florez were quarreling at a late-night party, and the argument devolved into an exchange of blows. Mr. Santana–Ruiz, armed with a knife, ended matters when he stabbed Mr. Florez multiple times, killing him. At trial, Geoffrey Clark, Mr. Santana–Ruiz's attorney, attempted to argue that Mr. Santana–Ruiz was legally justified in using deadly force against Mr. Florez because he was acting in self-defense. Mr. Clark's presentation of Mr. Santana–Ruiz's defense was marked by conduct that violated ethical codes and breached courtroom decorum.

¶ 2 The jury convicted Mr. Santana–Ruiz. He now argues that Mr. Clark's courtroom antics doomed his defense and constituted

---

1. In the briefs and in the record, Mr. Santana–Ruiz is referred to variously as Felipe Santana–Ruiz, Felipe Santana Ruiz, and Felipe Ruiz San-tana. Mr. Santana–Ruiz's counsel uses Felipe Santana-Ruiz in the appellate brief before us, and we do the same.

ineffective assistance of counsel. We agree with Mr. Santana–Ruiz that Mr. Clark's behavior was inexcusable—Mr. Clark deservedly received a jail commitment for contempt of court—but his lack of courtroom decorum in this case did not meet the legal standard, announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), required to sustain a showing of ineffective assistance of counsel. Mr. Clark's misconduct was offset by the overwhelming nature of the quality and quantity of evidence presented against Mr. Santana–Ruiz and diminished in its effect because the trial court took great care not to censure Mr. Clark before the jury.

## BACKGROUND

¶ 3 On January 27, 2002, Mr. Santana–Ruiz and Mr. Florez were both in Ogden, Utah, at a house party that had carried into the early morning hours. The two men began bickering, and Teresa Gallegos, the homeowner, asked Mr. Santana–Ruiz to leave the house. The two men continued to quarrel, however, and their argument escalated into a physical confrontation. They exchanged approximately three blows each in a ten-second interval. Mr. Santana–Ruiz's blows proved lethal because the hand that delivered them held a knife.

¶ 4 Mr. Geoffrey Clark represented Mr. Santana–Ruiz at his four-day trial and made self-defense the focus of his defense strategy. Mr. Clark injected into this strategy numerous serious ethical violations that eventually led the trial judge to cite him for criminal contempt of court and to order Mr. Clark to serve thirty days in jail. This court affirmed the trial court's order of contempt and resulting sanction against Mr. Clark in *State v. Clark*, 2005 UT 75, ¶¶ 23, 39, 124 P.3d 235.

¶ 5 We recounted fully the sordid saga of Mr. Clark's misdeeds in his appeal of the contempt order. *Id.* ¶¶ 2–13. We repeat many of those events here as they serve as the factual backdrop to Mr. Santana–Ruiz's claim that Mr. Clark's antics deprived him of a fair trial.

• Cocaine and the Toxicology Report

¶ 6 The state medical examiner prepared a toxicology report based on his examination of Mr. Florez's body. The report revealed that Mr. Florez had trace amounts of cocaine metabolite in his blood. The medical examiner testified at a preliminary hearing, however, that it was unlikely that Mr. Florez was under the influence of cocaine at the time of the stabbing because the testing revealed only trace amounts of metabolite and no active compound in Mr. Florez's system.

¶ 7 The State filed a motion in limine seeking to preclude the defense from making any reference to the toxicology report, and the court granted the motion. Mr. Clark, however, was determined to use the evidence and threatened, "[M]ark my words, at the end of this trial the jury's gonna know about his I.V. drug use and he's a violent criminal. Mark my words."

¶ 8 Proving himself to be a man of his word, Mr. Clark attempted to circumvent the order in limine. In his cross-examination of the medical examiner at trial, Mr. Clark asked where the paramedics inserted the intravenous catheters into Mr. Florez's veins. The State objected, recognizing Mr. Clark's less than subtle attempt to show that the paramedics inserted the catheter into Mr. Florez's neck because prior intravenous drug use had ruined the veins in his arms. After a short sidebar conference, the court sustained the State's objection. Undeterred by this ruling, Mr. Clark proceeded to ask the examiner about the toxicology report and about what substances the medical examiner found in Mr. Florez's blood. The prosecution again objected, and the court sustained the objection.

¶ 9 Then, when a juror submitted a written question asking about the toxicology report, Mr. Clark stated, "Great question. I think it should be asked," making it appear as though the prosecution was hiding evidence. After the court reformulated the juror's question to the examiner to conform to the motion in limine by asking what drugs the victim may have been given in the hospital, Mr. Clark said, within the jury's hearing, "Your Honor, I don't think that was specifically the question. I think the question specifically was

illegal drugs." The trial judge excused the jury and reprimanded Mr. Clark.

● Teresa Gallegos

¶ 10 Teresa Gallegos, the owner of the home where the stabbing occurred, was a trial witness for the State. In an effort to impeach her testimony on cross-examination, Mr. Clark asked Ms. Gallegos if she had a problem with drinking and asked her to explain a document that he handed to her. The prosecution asked to see the document, which, upon inspection, appeared to suggest that Ms. Gallegos had been convicted of a crime. The State objected on the grounds that the document was not certified. The trial judge told Mr. Clark that he could ask Ms. Gallegos only whether she had been convicted. Mr. Clark then asked Ms. Gallegos if she had ever been "involved in a D.U.I. or alcohol-related offense." The court again corrected him, and he moved on. In the contempt hearing that followed the jury trial, the trial court found that "Mr. Clark wanted the jury to believe the paper was an official document" and that "[t]his was an act of deceit and dishonesty by Mr. Clark."

● Reference to Threats of Violence

¶ 11 During the trial, the prosecution called Mr. Santana–Ruiz's half-brother Marcos Ruiz to the stand and asked for his name and address. Mr. Clark objected, "I'm gonna object at this time, your Honor. The court is well aware of the threats of violence in this case...." However, no evidence had been introduced to suggest that any witness had been threatened.

● Conferences at the Bench

¶ 12 Throughout the trial, the trial judge repeatedly called the parties to conferences at the bench. On two separate occasions, Mr. Clark walked away from the bench in the middle of the conference. The trial judge called him back and reprimanded him.

● Closing Argument

¶ 13 During his closing argument, Mr. Clark again raised the specter of Mr. Florez's cocaine use. Summarizing the night's events, he said, referring to Mr. Florez, "Boy, he's got that cocaine in his system, he's got that alcohol in his system, and he wants to fight." Then, after elaborating further, he explained, "And at the time [Mr. Santana–Ruiz is] being accosted by this crowd, straight through the middle of the crowd comes a man, flailing, wild, hopped up on coke, coming at him, bigger than him."

¶ 14 Finally, Mr. Clark tried to inject drama into his closing argument by attempting to tear a piece of evidence. He had argued that, at the party, Mr. Santana–Ruiz was being pushed around by several other party-goers in the moments leading up to his brief scuffle with Mr. Florez. Shortly after the incident, Mr. Santana–Ruiz told police that his sweatshirt had been torn during the fracas. The officer who inspected the sweatshirt at trial, however, found no tears. Nevertheless, during his closing argument, Mr. Clark brought the sweatshirt before the jury and pulled on it. The prosecution objected. The court inquired about Mr. Clark's intent. The following exchange ensued:

The Court: Well, you're—well, you're not going to tear it, are you?

[Lead Prosecutor]: Yes, he just did, your Honor.

[2nd Prosecutor]: He just did. He just did.

Mr. Clark: Did I tear it? Did I tear it?

The Court: Okay. Well, don't—don't tamper with the evidence or alter the evidence.

[2nd Prosecutor]: He's already done that, your Honor.

Mr. Clark: Look at the threads. Look at the threads. It is wholly possible that he heard a rip. Wholly possible.

The Court: So did you just tear the sweater?

Mr. Clark: No sir.

[Lead Prosecutor]: Your Honor, I heard—

[2nd Prosecutor]: I heard it tear.

Mr. Clark: Did you hear it rip, Ladies and Gentlemen of the jury?

The Court: No, no, no, no. Don't—don't talk to the jury that way. I want to know if you altered the evidence just now.

Mr. Clark: No, not at all.

The Court: Okay. So there's no—there's no tearing?

Mr. Clark: No tearing at all.

The Court: All right.

[Lead Prosecutor]: Your Honor, I heard a sound that would indicate some tearing. Whether it's visible or not—

The Court: All right. Well, we'll check it out later. I—go ahead.

¶ 15 At the conclusion of the trial, one that the trial judge characterized as an "adventure," Mr. Santana–Ruiz was convicted as charged. Mr. Santana–Ruiz later moved for and was granted a remand pursuant to rule 23B of the Utah Rules of Appellate Procedure to address counsel's alleged ineffectiveness for failure to convey a plea offer and for advising Mr. Santana–Ruiz to discharge his Spanish language interpreter.

¶ 16 The court conducted an evidentiary hearing on the motion and determined that Mr. Clark had, in fact, conveyed the plea offer to Mr. Santana–Ruiz and did not commit ineffective assistance of counsel in that respect. The trial court also found that Mr. Santana–Ruiz understood the trial proceedings in English and that it was not ineffective assistance to dismiss the court interpreter.

¶ 17 Mr. Santana–Ruiz then filed an untimely appeal that was dismissed for lack of jurisdiction. Mr. Santana–Ruiz responded by moving to be resentenced under the protocol then in place for preserving appeals based on claims of ineffective assistance of counsel that would be otherwise time-barred.[2] The court of appeals granted the motion. Mr. Santana–Ruiz was resentenced, a new judgment was entered, and his time for appeal was refreshed. Mr. Santana–Ruiz now comes before us on direct appeal from this reentered judgment.

## ANALYSIS

### I. MR. CLARK'S DISRESPECTFUL AND INAPPROPRIATE CONDUCT DID NOT AMOUNT TO INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 18 As we made clear in *State v. Clark*, 2005 UT 75, 124 P.3d 235, Mr. Clark's courtroom antics deserved formal censure. Outrageous misbehavior by counsel, however, does not, *ipso facto*, mean that the client received ineffective assistance. Here, we conclude that Mr. Clark's brand of misconduct did not deprive Mr. Santana–Ruiz of effective counsel because it visited no prejudice upon Mr. Santana–Ruiz's cause.

¶ 19 The Sixth Amendment guarantees criminal defendants the right to counsel, which the United States Supreme Court has defined to include "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citation omitted). To prevail on a claim for ineffective assistance of counsel, the defendant has the burden of proving (1) "that counsel's performance was deficient" and (2) that "the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Unless both elements are present, a conviction will stand. *Id.* In fact, the United States Supreme Court instructed, "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." *Id.* at 697, 104 S.Ct. 2052. Following the Supreme Court's direction, we dispose of this case based on a lack of sufficient prejudice alone.

### A. Mr. Santana–Ruiz Failed to Demonstrate That His Case Was Prejudiced by Mr. Clark's Representation

¶ 20 Mr. Santana–Ruiz did not present sufficient evidence to establish that the outcome of his case would have been differ-

---

2. Mr. Santana–Ruiz moved for resentencing under *State v. Johnson*, 635 P.2d 36 (Utah 1981). Under *Johnson*, we provided a procedure whereby appellants who were prevented from bringing a timely appeal through no fault of their own could restore their rights to appeal by filing a motion for resentencing in the trial court. In *Manning v. State*, however, we overruled *John-*

*son*, explaining that certain evolutions in Utah's statutory law and procedural rules rendered *Johnson* "no longer functional." 2005 UT 61, ¶ 11, 122 P.3d 628. We then "outline[d] a new procedure to restore the right to appeal for a defendant who proves ... that he has not knowingly or voluntarily waived" the right to appeal. *Id.*

ent without Mr. Clark's representation. To show prejudice in the ineffective assistance of counsel context, the defendant bears the burden of proving that counsel's errors "actually had an adverse effect on the defense" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693–94, 104 S.Ct. 2052.

¶ 21 Mr. Santana–Ruiz asks this court to exercise its inherent supervisory authority and find ineffective assistance of counsel in the interest of fairness, even if he falls short of persuading us that Mr. Clark's antics caused him prejudice. This request is not as farfetched as it may appear at first glance. A court "may presume prejudice in circumstances where it is 'unnecessary and ill-advised to pursue a case-by-case inquiry to weigh actual prejudice.'" *Parsons v. Barnes,* 871 P.2d 516, 523 n. 6 (Utah 1994) (quoting *State v. Brown,* 853 P.2d 851, 857, 859 (Utah 1992)). Mr. Santana–Ruiz, however, offers little analysis on why we should call upon this power—one that we store in the remote corner of the judicial arsenal—in this circumstance, and we see no reason why prejudice should be presumed here. We can discern no reason why, as a matter of principle or analysis, we should assess the effectiveness of a contemptuous but otherwise competent attorney differently than we would the effectiveness of a well-mannered but incompetent one. We therefore decline to relieve Mr. Santana–Ruiz of his burden of proving prejudice.

¶ 22 Despite the foregoing observation, we nevertheless believe that it is possible for an attorney's conduct at trial to undermine our confidence in the adjudicative proceedings and to prejudice the defendant to an extent that would satisfy the second *Strickland* element. Whether trial counsel's inappropriate comportment at trial can be so prejudicial to the defendant as to constitute ineffective assistance of counsel is a matter of first impression for this court. We therefore take this opportunity to articulate several factors that courts should consider in determining whether an attorney's ethical misconduct prejudiced a criminal defendant.

¶ 23 In making a prejudice determination in this context, we look primarily to whether the proceedings at trial compromised the outcome of the case. Specifically, we examine whether and to what extent the attorney's conduct affected (1) the ability of the finder of fact to comprehend the evidence, (2) the impartiality of the trial judge, and (3) the ability of the finder of fact to perform its duties. If it appears from a consideration of these and other relevant facts that the overall integrity of the trial was compromised by the attorney's misconduct, then a finding of prejudice will be appropriate.

1. Mr. Clark's Misbehavior Did Not Make the State's Evidence Stronger, But Rather Improperly Bolstered Mr. Santana–Ruiz's Defense

¶ 24 We first consider how the attorney's misconduct affected the ability of the jury to comprehend the evidence. To this end, we focus on whether the defendant would be in a better position—i.e., more likely to receive a favorable jury verdict—absent the attorney's misconduct. Often, the purpose of an attorney's misconduct will be to communicate matters to the jury that are favorable to the defendant but have been deemed inadmissible. In such cases, the defendant is more likely than not to benefit from the attorney's misconduct because the jury will have been exposed to more "evidence" favorable to the defendant than it otherwise would have. The defendant, in that case, does not suffer prejudice.

¶ 25 In this case, Mr. Clark designed his inappropriate courtroom behavior to allow the jury to hear matters that were inadmissible but helpful to the defendant. Mr. Clark succeeded in this undertaking. After a preliminary hearing where the medical examiner testified that trace amounts of cocaine metabolite were detected in Mr. Florez's blood, the State successfully moved, in limine, to prohibit Mr. Clark from making reference to the report.

¶ 26 Despite this order, Mr. Clark made certain that the jury knew of Mr. Florez's cocaine use as part of an effort to show that Mr. Florez, influenced by the cocaine, was

the aggressor and that Mr. Santana–Ruiz was acting in self-defense. Mr. Clark asked the medical examiner on cross-examination where the paramedics had inserted the intravenous catheters into Mr. Florez's veins, seeking to show that the paramedics had inserted the catheter into Mr. Florez's neck because his veins in his arms had been ruined by drug use. The State objected, and the trial court sustained the objection. Shrugging off the ruling, Mr. Clark then asked about the toxicology report and about what substances the medical examiner found in Mr. Florez's blood. Again, the State objected, and the court sustained the objection. But Mr. Clark's improper line of inquiry clearly resonated with the jury, as one juror was moved to submit a question to the judge about the toxicology report.

¶ 27 Narrowing the scope of the question, the court asked the medical examiner about what drugs Mr. Florez had been given at the hospital. In response, Mr. Clark said, within the jury's hearing, "Your Honor, I don't think that was specifically the question. I think the question specifically was illegal drugs."

¶ 28 Refusing to abandon the point he was barred from making before the trial began, Mr. Clark again referenced Mr. Florez's cocaine use in his closing argument. While summarizing the events on the night of the fight, Mr. Clark said, "Boy, he's got that cocaine in his system, he's got that alcohol in his system, and he wants to fight." Mr. Clark continued, "And at that time [Mr. Santana–Ruiz is] being accosted by this crowd, straight through the middle of the crowd comes a man, flailing, wild, hopped up on coke, coming at him, bigger than him." Mr. Clark's behavior was certainly inappropriate, but it was designed to permit Mr. Clark to press what he clearly believed to be an important element of his defense strategy. That he realized this goal may have been contemptuous, but it was not prejudicial to Mr. Santana–Ruiz.

**2. Mr. Clark's Misconduct Did Not Affect the Trial Court's Impartiality**

¶ 29 Next, we consider how trial counsel's misbehavior affected the trial court.

Trial counsel's misbehavior may prejudice a defendant if counsel's behavior evokes a reaction from the trial judge that impairs his impartiality. We trust trial judges to be able to maintain an unbiased approach to conducting the trial, even in the face of preposterous and disrespectful activities by an attorney. But it is not outside the realm of possibility for a trial judge to become biased against an attorney and for that bias to translate into prejudice against the party represented by the offending attorney. We will therefore review the record to see how the trial judge handled the misbehaving attorney and whether there is any indication that the trial judge allowed a dislike for the attorney to affect his judgments.

¶ 30 We take this opportunity to remind attorneys of the pitfalls that may accompany the pursuit of this argument. Alleging that a trial judge allowed his dislike of trial counsel to affect his judgment is a serious charge and should not be undertaken lightly. Any allegation that a trial judge became biased against a defendant should be supported by copious facts and record evidence. And any such allegation should be made in a reserved, respectful tone, shunning hyperbole and name-calling. *See generally Peters v. Pine Meadow Ranch Home Ass'n,* 2007 UT 2, 151 P.3d 962 (striking appellant's briefs for making inappropriate and unsupported allegations regarding the court of appeals panel that heard the case below).

¶ 31 In this case, the trial judge, the Honorable Ernest W. Jones, managed his courtroom with impeccable decorum despite Mr. Clark's misbehavior. He showed great restraint and impartiality in the face of repeated demonstrations of disrespect by Mr. Clark. There is no suggestion that Mr. Clark's behavior made any dent in his armor of impartiality, and we see absolutely no indication of it. Mr. Clark's behavior, therefore, did not prejudice Mr. Santana–Ruiz in this respect, either.

**3. Mr. Clark's Misconduct Did Not Affect the Jury's Ability to Perform its Duties**

¶ 32 Finally, we examine the effect of trial counsel's actions on the jury's ability to

perform its duties. This is really a catchall category, where any number of potential prejudices could be considered. For example, under this prong, we could consider how much of counsel's antics the jury saw and how the trial court and the prosecution handled counsel's misbehavior when the jury was present. If counsel's misconduct occurred largely outside the presence of the jury, then there is little threat of prejudice. Similarly, if the trial judge and the prosecutors were restrained in taking exception to counsel's conduct, at least until they were outside the presence of the jury, then the danger of prejudice is minimized.

¶ 33 It would also be appropriate here to consider the cumulative effect trial counsel's misbehavior had on the jury. There is a possibility that the jurors, observing counsel's misbehavior, will come to distrust and dislike the attorney and will transfer that distrust and dislike to the defendant. If the jury's verdict was driven largely by a distrust and dislike of trial counsel, then the defendant has been prejudiced. This is a real threat, which may be explored by counsel in an action alleging ineffective assistance of counsel. A trial judge has little ability to gauge the existence and extent of cumulative prejudice caused by the improper conduct of counsel. Rule 606(b) of the Utah Rules of Evidence prohibits virtually all inquiries into the jury deliberation process. The restrictions imposed by rule 606(b) are motivated by the concern that allowing the penetration of the jury room to uncover and scrutinize the deliberation process can only lead to mischief and compromise the integrity of juries. It is, therefore, important that trial judges remain vigilant for signs of misconduct by counsel and take prompt corrective action when it surfaces.

¶ 34 In this case, Judge Jones and the prosecution showed considerable restraint and waited until they were outside the presence of the jury before discussing Mr. Clark's misbehavior in detail. This significantly reduced any potential prejudice to Mr. Santana–Ruiz. The trial court, commendably, mitigated the prejudice that Mr. Santana–Ruiz suffered from Mr. Clark's behavior by taking care not to reprimand Mr. Clark before the jury. When the court did reprimand Mr. Clark, it did so carefully, delaying extended censure until the jury was excused. For example, when the prosecution asked the defendant's half-brother Marcos Ruiz to state his address and Mr. Clark objected, referring to "threats of violence," the trial court merely asked the prosecution if it needed the address and instructed the prosecution to go to the next question. The court waited until the jury had withdrawn to reprimand Mr. Clark for his behavior. The court demonstrated similarly admirable restraint throughout the proceedings.

¶ 35 Moreover, the prosecution did not move for, and the court did not address, the order for contempt until the jury had retired to deliberate. The court did not even warn Mr. Clark of the threat of a contempt order in front of the jury. In sum, where there was a threat of prejudice arising from Mr. Clark's conduct, the trial court contained the threat and preserved the integrity of the jury. The trial court, therefore, appropriately mitigated any prejudice that Mr. Santana–Ruiz might have suffered as a result of Mr. Clark's conduct.

¶ 36 In addition, although Mr. Santana–Ruiz asserts that the jury became generally biased against him because of Mr. Clark's antics, he provides no support for his accusation. It is a bald allegation lacking any evidentiary support. And based on our own review of the record, we find no support for it. We find, therefore, that Mr. Santana–Ruiz did not suffer from such a prejudice.

## CONCLUSION

¶ 37 Because we conclude that Mr. Clark's actions did not prejudice Mr. Santana–Ruiz, we hold that Mr. Santana–Ruiz did not receive ineffective assistance of counsel. Mr. Santana–Ruiz's conviction is affirmed.

¶ 38 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.