2010 UT App 107

**STATE of Utah, Plaintiff and Appellee,**

v.

**Adama JADAMA, Defendant and Appellant.**

**No. 20080653-CA.**

Court of Appeals of Utah.

April 29, 2010.

546

Troy L. Booher, Michael D. Zimmerman, and Katherine Conyers, Salt Lake City, for Appellant.

Mark L. Shurtleff and Karen A. Klucznik, Salt Lake City, for Appellee.

Before Judges DAVIS, ORME, and THORNE.

## OPINION

DAVIS, Presiding Judge:

¶ 1 Defendant Adama Jadama appeals his conviction of aggravated arson. He argues that the trial court erred in determining that he did not need an interpreter for trial. He also alleges that his trial counsel acted ineffectively by failing to secure an interpreter when given the opportunity and by failing to request a formal hearing on the matter before trial. Jadama additionally argues that the trial court should have granted his motion for a mistrial due to prosecutorial misconduct. We affirm.

## BACKGROUND

¶ 2 Jadama is an immigrant to the United States, moving here as a refugee from Gambia when he was twelve years old. Jadama, whose native language is Mandinka, had at one point attended an English-speaking school in Gambia and had continued to study English upon arrival in the United States, including studying English with a special tutor. Jadama thereafter graduated from high school and attended college for a period of time. Further, Jadama was employed in the fast food industry and used his English skills to some extent there.

¶ 3 In late 2006, at which point Jadama had been in the United States for about ten years, he was charged with aggravated arson, a first degree felony, *see* Utah Code Ann. § 76–6–103(2) (2008), in connection with a fire set at his stepmother's home. A hearing was held in February 2007, relatively early in the case, to determine whether Jadama needed an interpreter. This hearing was not an evidentiary hearing, but ended up simply being a discussion between the trial court, Jadama, and the attorneys regarding securing an interpreter. Although defense counsel stated that Jadama had been in the country almost a decade, taken English as a Second Language classes, and graduated from high school, she was of the opinion that, due to his broken English, Jadama needed an interpreter. Jadama expressed his opinion, through an interpreter, that "he would be more comfortable with an interpreter." The prosecutor noted that he had received a letter from Jadama in English and that the police had interviewed Jadama in English, suggesting that the prosecutor believed that Jadama probably did not need an interpreter. But the prosecutor ultimately stated that he would not object to the use of an interpreter. During the hearing, the trial court engaged Jadama in a limited amount of basic English dialogue, during which Jadama answered all of the court's questions appropriately and indicated no lack of understanding. At one point in the exchange, when Jadama stated that he spoke and understood some English, the trial court responded, "I'm not sure how much or how little. That might be the subject of a future proceeding; do you understand that?" After Jadama once more indicated his preference for an interpreter, the trial court "charge[d] both the parties ... with locating an appropriate interpreter," remarking beforehand simply that "under the circumstances I think it would be a terrible idea not to appoint an interpreter" and that "given the fact that he's facing a first degree felony we ought to have an appropriate translator."

¶ 4 Several hearings followed. At one held in May 2007, the trial court started the proceeding by stating that the parties were apparently still attempting to find an interpreter. Jadama responded by saying, "All right. That's fine. I don't need an interpreter real-

ly." However, Jadama also mentioned that he did not "speak very good English." The trial court then responded, "It sounds pretty good to me to tell you the truth." The trial court also then mentioned that it had received a letter from Jadama, which was written in English. Ultimately, the trial court suggested a thirty-day continuance to give the parties more time to locate an interpreter, which was proving to be a difficult task, but also stated, "I have concerns about whether Mr. Jadama really needs an interpreter, frankly."

¶ 5 In a subsequent hearing, defense counsel petitioned for an inquiry into Jadama's competency, asking that the inquiry proceed without an interpreter but that the alienists speak slowly, and saying that Jadama would raise any questions he might have during the inquiry. In response, the trial court stated, "I think that's correct. Mr. Jadama, you have a pretty good facility with the English language." And the reports subsequently generated from the competency inquiry indicated no difficulty as a result of Jadama's English language skills.[1] The alienists were able to determine, through Jadama's responses in English, that Jadama's understanding of the proceedings and his ability to participate therein were sufficient to proceed with trial.[2] The alienists' reports also disclosed facts not previously known to the trial court, specifically, that Jadama attended an English-speaking school in Gambia until third grade, that he had a tutor to help him with English upon arrival in the United States, and that he attended one semester at a community college.

¶ 6 At a pretrial hearing held in October 2007, the issue of an interpreter was once again raised. The prosecutor raised the issue, asking that it be put to rest and stating that there was no need for an interpreter. The following dialogue then ensued:

[DEFENSE COUNSEL:] What I can tell the Court is, yes, it is true that Mr. Jadama speaks pretty good English. He understood the conversation that you were having. I asked him questions, if he understood the terminology they were using, and all of the indications for that conversation is, yes, he did understand. But as recently as this morning when we were discussing things with Mr. Jadama about the case, he was not familiar with the terminology that I used. He used terminology that I had to find an alternate word for that he understood. So it is not as clear as the State would suggest it is.

I'm not suggesting that it is not clear enough to go forward, but the tone in which [the prosecutor] addressed the Court is to suggest that we have been playing fun and games with the interpreter, and that is clearly not the case.

THE COURT: I have had Mr. Jadama in front of me a number of times and he seems to understand perfectly well. I'm able to carry on a conversation with him without any difficulty.

I appreciate there is terminology and other things that are used, but would charge you with taking your time in explaining it. I'm mean, it's not lost on me. The man has a high school diploma, correct?

[JADAMA:] Yes.

THE COURT: He has been in the United States since he was 9 years old or so?

[JADAMA:] Eleven years since I was in the United States.

THE COURT: Listen to him now.... It is frustrating to have gone through this process and had the delays that [the prosecutor] refers to, in part due to this question of an interpreter when—while he may not understand at the level of someone who has obtained a [law degree], he's certainly, I find, to be completely conversational in English.

[DEFENSE COUNSEL:] I don't think what I said is contradictory to what you

---

1. One report specifically related that Jadama had indicated that he did not require an interpreter for the evaluation and that the relevance of Jadama's responses suggested that he had no problem understanding the questions asked.

2. One report concluded with the following sentence: "He may occasionally need some brief interlude in which his attorney has an opportunity to explain exactly what is happening but he is certainly capable of understanding and comprehending."

said. However, I would also note if we are going to have this discussion that the interpreter, and request for an interpreter in part was on Mr. Jadama's request because there was some difficulty in understanding what was going on.

Clearly, when you have a one on one conversation with him, it is not so difficult when there is two or more voices or a dialogue that is more than a one on one, it does get more difficult.

THE COURT: I see no *need* for an interpreter. If you believe that a hearing is necessary beforehand *to establish what is needed,* then I say bring it to the Court's attention. I have heard nothing even from you to suggest that that's the case.

(Emphases added.) Following this dialogue, defense counsel expressed the position, more than once,[3] of having no intention to request a hearing on the interpreter issue.

¶ 7 The case then proceeded to trial. The prosecution presented evidence of the following chain of events: on the evening of November 30, 2006, Jadama went to his stepmother's house and demanded money he thought one of her guests owed him; the police were eventually called to the house and made Jadama leave;[4] the following morning, Jadama returned and demanded $300 from his stepmother; the stepmother refused to give Jadama money and called the police; the police arrived and spoke with both Jadama and his stepmother, and the police report showed that Jadama had stated that if he did not get the money from his stepmother, "he was going to burn the house down"; the police again made Jadama leave and told him not to return; shortly thereafter, Jadama purchased "a dollar's worth of gas" in a milk jug from a nearby convenience store; later that morning, a neighbor saw Jadama at his stepmother's house; around that same time, a fire was started in the stepmother's house via a milk container of gas thrown through a window of the house. Jadama did not contest any of this evidence. Instead, his story was that he had returned to his stepmother's house with his friend and that while Jadama was at a neighbor's house trying to telephone his stepmother for permission to pick up his belongings, the friend must have started the fire in the stepmother's home.

¶ 8 Against defense counsel's recommendation, Jadama testified at trial, at no time indicating a lack of understanding of the questions asked him. Although a couple of Jadama's answers were not responsive to the questions asked—a circumstance that is far from unprecedented even when there is no question about English proficiency—it appears that in those situations, either the question was able to be rephrased and Jadama then presented a responsive answer to the question, or the nonresponsive nature was due to Jadama elaborating on his previous answer when the attorney inserted a new question. One problematic answer that Jadama gave at trial was when his counsel asked him whether the police had made him leave his stepmother's house the night before the fire. Jadama responded, "No, not at all. They got me for paraphernalia, because I was tired and had red eyes." This response was particularly problematic to Jadama's defense because it had previously been established that evidence of Jadama's arrest on paraphernalia possession would not be admitted, but it was a responsive answer, albeit unhelpful and unnecessary.[5] The mention of

---

**3.** Each of Jadama's two attorneys indicated that they had no intention of pursuing the interpreter issue.

**4.** In reality, the police arrested Jadama that evening for possession of paraphernalia, but the parties had stipulated that this information would not be revealed at trial.

**5.** Jadama answered the question asked, responding that the police did not make him leave the house. Then Jadama went on to elaborate as to what the police *did* do. We are not persuaded that Jadama's mistake of saying too much was indicative of a failure to understand the question asked or that the response would have been different when given through an interpreter, who would have been required to simply convey Jadama's answer as he had stated it, *see State v. Trujillo,* 117 Utah 237, 214 P.2d 626, 635 (1950) ("It is the function of an interpreter to transmit question and answer between counsel and the witness, that the court and jury may hear and understand what is said. . . . It is not his function to try to guide the witness in his answers along a line of testimony he believes is desired. The most he should do is to repeat the questions in the foreign language and to see that the witness

this information by Jadama opened the door to some further questioning by the prosecutor on cross-examination. However, those questions were brief because defense counsel promptly objected to the line of questioning and the trial court instructed the prosecutor to "move on."

¶ 9 Shortly thereafter in the cross-examination of Jadama, the following exchange occurred:

Q. You said you went downtown?

A. Yes, I went downtown.

Q. To the shelter?

A. Yes, to the shelter.

Q. To buy drugs?

A. Not to buy drugs.

Defense counsel again objected, and the trial court struck both the question and answer and admonished the prosecutor "not to do that again." At the end of cross-examination, the jury was released for a recess and defense counsel moved for a mistrial based on the prosecutor's inappropriate questioning about going downtown to buy drugs. The trial court took the motion under advisement, giving the parties an opportunity to do research on the matter that evening and submit relevant case law the following morning before a decision was made. Thereafter, the prosecutor called one rebuttal witness,[6] the jury instructions were given, and court was adjourned.

¶ 10 The following morning, the trial court, after some discussion with the attorneys, ultimately denied the motion for a mistrial, reasoning as follows: "It is the defendant that introduced the concept or topic of drugs generically into the litigation by raising his arrest the evening before for the possession of drug paraphernalia.... So there is a little bit of fault to be placed on the shoulders of the defendant." The trial court also explained that the other factors he considered were that Jadama answered "no" to the question; the exchange was stricken from the record; the prosecutor was admonished; the jury instructions provided, in more than one place, that the statements of lawyers

were not to be considered evidence; there was one intervening witness between Jadama's testimony and deliberation; and that the trial court had adjourned for the day and given the case an overnight break in order to avoid deliberations commencing so soon after the inappropriate question. The trial court then, with defense counsel's approval, gave the jury a curative instruction "taking [the prosecutor] directly to task":

> All right, members of the jury, during his cross examination of Mr. Jadama, the prosecutor asked whether he, being Mr. Jadama, went to the shelter to obtain drugs. That question was entirely inappropriate, and had no basis in fact.
>
> It is for that reason that I sustained the objection and admonished the prosecutor. With this in mind, I remind you again that the statements of the lawyers are not evidence. I also remind you of your duty to decide this case based only on the evidence presented and admitted during this trial.

¶ 11 The jury ultimately rendered a guilty verdict. Jadama was thereafter sentenced to an indeterminate term of five years to life in prison. Jadama now appeals.

## ISSUES AND STANDARDS OF REVIEW

■■■ ¶ 12 Jadama first argues that the trial court erred by determining that he did not require an interpreter for trial. "[I]t is within the sound discretion of the trial court as to whether or not an interpreter is necessary.... Before the lower court is overruled in his use of an interpreter, there should be positive evidence of an abuse of discretion on his part." *State v. Trujillo*, 117 Utah 237, 214 P.2d 626, 634–35 (1950). And although a trial court should err on the side of caution in providing an interpreter, "[f]ailure to appoint an interpreter ... is reversible error only when the record shows that the defendant's presentation of the case has thereby been hampered." *State v. Drobel*, 815 P.2d 724, 737 (Utah Ct.App.1991) (citing *State v. Vasquez*, 101 Utah 444, 121 P.2d 903, 906 (1942)).

---

understands them; and then repeat in English the answers to the questions, be they what they may.").

**6.** The testimony from this witness was brief, spanning only four transcript pages.

■ ¶ 13 Jadama next argues that his trial counsel rendered constitutionally ineffective assistance by failing to secure an interpreter and by failing to request a formal hearing to establish that an interpreter was needed for trial. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

■ ¶ 14 Jadama further alleges that the trial court should have granted his motion for a mistrial due to prosecutorial misconduct. "[B]ecause the trial court is in the best position to determine the impact of a statement upon the proceedings, its rulings on whether the prosecutor's conduct merits a mistrial will not be overturned absent an abuse of discretion." *State v. Cummins*, 839 P.2d 848, 852 (Utah Ct.App.1992).

## ANALYSIS

### I. The Determination Regarding an Interpreter

■ ¶ 15 Jadama's primary argument on appeal is that the trial court erred by changing its prior observation that he required an interpreter. This argument is not well taken for several reasons.

¶ 16 First, we do not agree with Jadama that the trial court ever made the determination that Jadama needed an interpreter. Rule 3–306 of the Utah Rules of Judicial Administration, which governs the use of interpreters in judicial proceedings, provides that once a trial court determines that a defendant "has a limited ability to understand and communicate in English, a certified interpreter *shall* be appointed," Utah R. Jud. Admin. 3–306(6)(A) (2009) (emphasis added).[7] And after such a determination is made, the right to an interpreter may be waived only under the specific provisions of the rule, *see id.* R. 3–306(7)(A). However, as we have illustrated above in the recitation of the facts, the trial court's initial decision in February 2007 to appoint an interpreter for Jadama was not based on any finding that Jadama *needed* an interpreter, that is, that Jadama's English abilities were so limited as to prevent him from adequately understanding and communicating in English during legal proceedings. Indeed, the only statement from the hearing that the trial court made as to Jadama's English abilities was where, in response to Jadama's assertion that he could speak and understand some English, the trial court stated, "I'm not sure how much or how little. That might be the subject of a future proceeding[.]" Thus, the trial court directly commented on its lack of knowledge concerning whether Jadama *needed* an interpreter. Nonetheless, where defense counsel had expressed her opinion that Jadama needed an interpreter, Jadama indicated that he would prefer an interpreter, and the prosecutor stated that he had no objection to the appointment of an interpreter, the trial court commented, "Under the circumstances I think it would be a terrible idea not to appoint an interpreter." Thus, it appears that the trial court was simply attempting to accommodate Jadama's desire

---

7. Because rule 3–306 was amended in significant respects in late 2009, subsequent to the filing of this appeal, we cite to and analyze the earlier version of the rule that is applicable to this case. Although the concurring opinion correctly points out that this earlier version provides for the appointment of an interpreter "[w]hen an interpreter is requested," *see* Utah R. Jud. Admin. 3–306(6)(A) (2009), the parties have not commented on, let alone analyzed, this provision or its applicability to this case. Regardless, we cannot agree with the concurrence that this language mandates that *any* person's request for an interpreter shall be binding on the trial court. The rule specifically states that its purpose is "to secure the rights of persons who are unable to understand or communicate adequately in the English language when they are involved in legal proceedings," *id.* R. 3–306, and that it is applicable only to those persons "who ha[ve] limited ability to speak or understand the English language," *id.* R. 3–306, (1)(H). Thus, we do not agree that when a defendant not described by such language requests an interpreter, the trial court is bound by this rule to appoint one. Instead, we think that whether the rule *requires* complying with a defendant's request for an interpreter is dependent on his English speaking and comprehension abilities.

Nonetheless, it may be best for a trial court to err on the side of caution and attempt to honor the request regardless of whether the rule requires it. But when a court does so, we do not think that it should be held to a higher standard than the rule itself if later, due to evolving circumstances, the court must address the question of whether under the rule the defendant *needs* an interpreter.

for an interpreter without regard to whether Jadama actually needed one. And such an accommodation is not only appropriate, but encouraged. *See generally Vasquez*, 121 P.2d at 906 ("It is far better to err by traveling a longer road or taking more time than to err by depriving one of a fair trial for want of understanding or comprehension of what is taking place."); *Drobel*, 815 P.2d at 737 ("[O]ur supreme court has held that it is better, in a questionable case, to err on the side of providing an interpreter."). But, we emphasize, such an accommodation is not equivalent to a determination by the trial court under the applicable rule that a defendant *needs* an interpreter. *Cf. State v. Karumai*, 101 Utah 592, 126 P.2d 1047, 1050 (1942) ("A person may understand much more than he speaks and may wish an interpreter when testifying, even though one is not necessary.").

¶ 17 Second, we do not agree that a right to an interpreter extends as far as Jadama seems to suggest, that is, to *any* defendant who speaks English as a second language and who does not completely understand legal terms and proceedings. The simple fact that a defendant's English abilities are limited in the sense that English is not his native language is not sufficient to require the appointment of an interpreter; a demonstrably limited ability in English is necessary for an interpreter to be required. *See City of Orem v. Lee*, 846 P.2d 450, 454 (Utah Ct.App.1993) ("The record in this case reflects that Lee understood the nature of the proceedings below. While Lee's English may have been somewhat broken, he was able to effectively communicate and respond to the court's and counsels' inquiry. It does not appear that counsel, nor the court, had any reason to believe that Lee required an interpreter ...."); *see also Karumai*, 126 P.2d at 1050 ("The rec-

ord does not disclose that the defendant was *so unable to understand* the English language that he was thereby materially affected in any of the proceedings in this case in making his defense. All of defendant's arguments based on such a premise must therefore fail." (emphasis added)). This is evidenced by the rule's stated intent "to secure the rights of persons who are unable to understand or communicate *adequately* in the English language when they are involved in legal proceedings." Utah R. Jud. Admin. 3–306 (emphasis added). Furthermore, a lack of understanding as to legal terminology and the way in which a case proceeds is certainly not unique to non-English speakers and is not the reasoning behind providing interpreters. Interpreters are provided only to redress problems directly arising from a language barrier, not to compensate for a defendant's lack of legal savvy. The latter deficiency is instead addressed by a defendant's right to counsel, not an interpreter. *Cf. State v. Drobel*, 815 P.2d 724, 737 (Utah Ct.App. 1991) ("Here the record reflects that Drobel had no difficulty in expressing himself to the court in English.... Upon inquiry into his request [for an interpreter], Drobel clarified that his main concern was with legal terminology. To allay that problem, he had standby counsel. Therefore, the trial court did not abuse its discretion in refusing to provide an interpreter for Drobel.").

¶ 18 Third, we are not convinced that the trial court's later determination that *did* address whether Jadama actually needed an interpreter was an abuse of the trial court's discretion. This determination occurred at a pretrial hearing about seven months—and six hearings—later than the trial court's initial February 2007 observations,[8] after many delays had been endured in the search for a Mandinka interpreter[9] and after the trial

---

8. Although during intervening hearings the trial court had indicated its doubt that an interpreter was really necessary, a definitive finding on the matter did not occur until the later pretrial hearing.

9. There is some discussion by the parties regarding Jadama's rejection of or problems with all of the interpreters that were proposed. It may be wise for a court faced with such a problem to

attempt to make the best selection from among the available interpreters. This would still be erring on the side of providing an interpreter but would also place on the defendant the burden to challenge the appointment appropriately through either a showing of the interpreter's "actual bias" or a showing that he was actually prejudiced by the use of that interpreter, *see State v. Fung*, 907 P.2d 1192, 1195 (Utah Ct.App.1995).

court had spent more time interacting with Jadama. Unlike the prior observation, the trial court this time specifically stated, "I see no need for an interpreter." [10] At that point, the trial court had, as it alluded to, benefitted from several more occasions to converse with Jadama—in more complex conversations than that of the February 2007 hearing—and observed there to be no problems in his understanding or communication abilities. [11] And defense counsel had stated, "I'm not suggesting that [Jadama's understanding] is not clear enough to go forward." Additionally, the trial court was aware of several other factors that could appropriately be considered in the determination: Jadama had been in the United States for many years, had taken English classes before and after immigrating, had graduated from high school in the United States, had used English in his employment, had been able to participate in a psychiatric evaluation in English, and had written letters to the prosecutor and the trial court in English. [12] *See Karumai,* 126 P.2d at 1050 (considering, in

determining that an interpreter was not required, that the defendant had lived in the United States for eighteen years, operated a restaurant, was able to answer a police officer's questions without hesitation, and explained his physical condition to a doctor in English); *State v. Ruesga,* 851 P.2d 1229, 1233 (Utah Ct.App.1993) (considering that the defendant read a written statement in English that he prepared with minimal assistance and that he "testified at the hearing with no apparent difficulty"); *Drobel,* 815 P.2d at 737 (considering that the defendant "had no difficulty in expressing himself to the court in English," had been schooled in English, "had used [English] to conduct business," and had been using English for seven years). And with its determination that Jadama did not need an interpreter, the trial court charged defense counsel with taking the time necessary to explain things to Jadama and also told defense counsel to move for a hearing on the matter if they felt like a formal hearing was necessary to establish whether an interpreter was necessary. *See*

10. And even were we to agree with Jadama that the February 2007 decision reflected the trial court's opinion that Jadama needed an interpreter, the trial court would still have the authority to change its mind at a later date, especially considering the further opportunities for interaction with and evaluation of Jadama that the trial court had between the two determinations. *See generally State v. Ruiz,* 2009 UT App 121, ¶ 10, 210 P.3d 955 ("[A] judge can change his or her mind any time up until the entry of final judgment, ... as a trial court is not inexorably bound by its own precedents." (internal quotation marks omitted)), *cert. granted,* 221 P.3d 837 (Utah Nov. 5, 2009) (No. 20090559). Jadama asserts, without any citation to legal authority, that a formal hearing is necessary to make a determination regarding an interpreter. But we note that the two hearings at issue here were of equal dignity. Neither hearing was evidentiary in nature; they consisted only of discussions with the attorneys and Jadama and did not involve the presentation of testimony or other evidence. Indeed, the trial court essentially acknowledged that no formal evidentiary hearing had taken place on the matter when the court ultimately encouraged defense counsel to pursue such a hearing if they considered it necessary.

11. We do not agree with Jadama that the trial court "confus[ed] the ability to converse with the ability to understand legal proceedings." The trial court's observation that Jadama was completely conversational—an observation made as a result of several interactions that took place

while Jadama was in court—is directly related to the question at hand. It is indicative of whether Jadama could "understand or communicate adequately in the English language when ... involved in legal proceedings," *see* Utah R. Jud. Admin. 3–306 (2009), or whether he had "a limited ability to understand and communicate in English," *see id.* R. 3–306(6)(A). Further, these interactions indicate not only that Jadama was conversational when having a one-on-one discussion with the trial court, but also that Jadama comfortably followed discussions held by the trial court and the attorneys, Jadama having jumped into these conversations at appropriate points to answer questions asked about, but not directed to, him.

12. Contrary to Jadama's indication otherwise, much of this information was not available at the February 2007 hearing. Thus, the trial court was more fully informed at the October hearing than it had been in February. *See generally State v. Vasquez,* 101 Utah 444, 121 P.2d 903, 906 (1942) ("It is important that the trial court in the exercise of its discretion as to the necessity of an interpreter, either for the defendant or for a witness, be fully advised."). And although the trial court did not elaborate on which of these factors it relied on for its decision, this alone does not indicate an abuse of discretion. *See generally Ruiz,* 2009 UT App 121, ¶ 13, 210 P.3d 955 ("[T]rial judges generally are not required to give reasons for discretionary rulings ...." (internal quotation marks omitted)).

*generally State v. Fung*, 907 P.2d 1192, 1194 (Utah Ct.App.1995) (citing favorably a case finding no error, "even though there was some indication that [the] defendant had a problem with English," where "the trial court allowed the trial to proceed and informed defendant's counsel that if at any point the defendant became confused or needed an interpreter to alert the court"). In response, defense counsel stated that the defense did not anticipate making such a request and planned on proceeding without an interpreter. *See generally Ruesga*, 851 P.2d at 1233 ("In light of defense counsel's agreement that defendant could understand English well enough to participate in the proceedings, we would certainly be reluctant to override the trial judge who reached the same conclusion after having had several opportunities to view and hear defendant."). We cannot say that the decision to forgo the appointment of an interpreter under these circumstances was an abuse of the trial court's discretion.

¶ 19 Fourth, we are not convinced that "the record indicates [that the] failure to provide an interpreter has in any manner hampered the defendant in presenting his case to the jury," *see State v. Vasquez*, 101 Utah 444, 121 P.2d 903, 906 (1942) (internal quotation marks omitted), which would be required for reversal, *see Drobel*, 815 P.2d at 737 ("Failure to appoint an interpreter ... is reversible error only when the record shows that the defendant's presentation of the case has thereby been hampered."). We do not see that any of the trial issues Jadama raises show prejudice. The fact that at multiple places in Jadama's testimony the transcript shows "inaudible" only demonstrates that the recording may not have adequately captured those statements. There is no indication whatsoever what the comments were or that the parties or the jury did not understand them. Likewise, the two nonresponsive answers Jadama gave at trial, *see supra* ¶ 8, did not prejudice his case. The nonresponsive answers contained no information that would have hurt his case, and the questions asked were thereafter rephrased and Jadama was able to give responsive answers. Finally, as to Jadama's claim that his use of "uh-huh" was confusing, we see no situation in which

the meaning of the term cannot be clearly ascertained from the context of the specific question that he was answering. Thus, Jadama has not shown how the participation of an interpreter would have given him a reasonable likelihood of a more favorable outcome.

**II. Ineffective Assistance of Counsel Claim**

 ¶ 20 Jadama next argues that his trial counsel rendered ineffective assistance by failing to secure an interpreter when first instructed to do so and by failing to request a hearing to establish the need for an interpreter when the trial court decided to proceed without one. "To prevail on a claim for ineffective assistance of counsel, the defendant has the burden of proving (1) 'that counsel's performance was deficient' and (2) that 'the deficient performance prejudiced the defense.'" *State v. Santana–Ruiz*, 2007 UT 59, ¶ 19, 167 P.3d 1038 (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Because both elements are required, the lack of either will cause the claim to fail. "In fact, the United States Supreme Court instructed, 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed.'" *Id.* (quoting *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052). Our analysis in the previous paragraph, together with the strong evidence against Jadama and the clear presentation of his incredible defense, shows that Jadama was not prejudiced by the failure to provide him an interpreter at trial. Thus, because these two claims of ineffective assistance hinge on trial counsel's failure to secure an interpreter at one point or another, Jadama cannot show prejudice for either claim. Consequently, the claims must fail.

**III. Refusal to Declare a Mistrial**

 ¶ 21 Jadama also argues that the trial court should have granted his motion for a mistrial due to a statement made by the prosecutor.

This court will reverse on the basis of prosecutorial misconduct only if [the] defendant has shown that "the actions or remarks of [prosecuting] counsel call to the attention of the jury a matter it would not

be justified in considering in determining its verdict and, if so, under the circumstances of the particular case, whether the error is substantial and prejudicial such that there is a reasonable likelihood that, in its absence, there would have been a more favorable result. . . ."

*State v. Cummins,* 839 P.2d 848, 852 (Utah Ct.App.1992) (second alteration and omission in original) (quoting *State v. Peters,* 796 P.2d 708, 712 (Utah Ct.App.1990)). Certainly, as the trial court recognized, the prosecutor's question about Jadama's alleged drug purchase was an inappropriate attempt to call the jury's attention to an issue they could not justifiably consider. However, the trial court took many steps to minimize the impact of this statement: The trial court promptly affirmed defense counsel's objection; struck both the question and answer; gave the jury instructions soon thereafter that expressed more than once that the statements of the attorneys were not evidence; recessed for the evening so as to put more time between the inappropriate question and jury deliberations; and gave, at defense counsel's request, a very pointed curative instruction, specifically identifying what question the jury was not to consider, explaining that the question was "entirely inappropriate" and had no basis in law or fact, and instructing that the question was not to be considered in the jury's deliberations.[13] We do not see that the trial court, which "is in the best position to determine the impact of a statement upon the proceedings," *id.,* abused its discretion by determining that a mistrial was not required under the circumstances.[14]

13. We also note that Jadama himself had already brought up the issue of his drug use and that the answer that the jury heard was that Jadama was *not* going downtown to purchase drugs.

14. Jadama argues that a comment made by his stepmother regarding his violence should factor into this prejudice determination. The complained of comment occurred as follows:

> Q. . . . . As you were standing here, talking with the police officer, you said there was another police officer there talking to your stepson, the defendant, [Jadama]?
> A. Yes.
> . . . .
> Q. Could you hear what [Jadama] was saying?

## CONCLUSION

¶ 22 Under the facts before it, the trial court did not abuse its discretion by failing to appoint an interpreter for Jadama. Nor do we see that the lack of an interpreter hampered Jadama's ability to present his defense. And because of this lack of prejudice, Jadama's ineffective assistance of counsel claims fail. Finally, we are not convinced that the trial court abused its discretion by denying the motion for a mistrial due to the one inappropriate question asked by the prosecutor.

¶ 23 I CONCUR: GREGORY K. ORME, Judge.

THORNE, Judge (concurring in the result):

¶ 24 I concur in the result of the majority opinion, but write separately to note my concerns regarding the majority's conclusion that the trial court never determined that Jadama needed an interpreter. *See supra* ¶ 16. I believe that the trial court did determine that Jadama needed an interpreter and then erred by changing its prior ruling without making any factual findings on Jadama's ability to understand English proficiently enough to understand or comprehend the legal proceedings.

¶ 25 Here, the trial court initially held a specific hearing, with the benefit of a Mandinka interpreter, noting that "the purpose of [the] hearing [was] to decide whether Mr. Jadama needs a Mandinka interpreter, or

> A. Yeah, he was very, very loud that morning, very loud.
> Q. Very loud?
> A. Yes.
> Q. And so you heard a lot, but not everything, maybe; or did you hear everything he said?
> A. He's assaulting me a lot, my mom, myself—
> [Objection made and addressed.]

We do not agree that the stepmother's comment, when taken in context, revealed to the jury any history of violent behavior between Jadama and his stepmother. Instead, the jury likely understood the comment to mean that when the police were there, Jadama was saying bad things about his stepmother, i.e., verbally assaulting her. In any event, defense counsel declined a curative instruction related to this comment.

frankly, any type of interpreter." At the hearing, defense counsel informed the trial court about the circumstances necessitating an interpreter, and Jadama requested an interpreter, stating that he would be more comfortable with one. After hearing from both sides and speaking in English with Jadama, the trial court determined that Jadama needed an interpreter and ruled that "[u]nder the circumstances I think it would be a terrible idea not to appoint an interpreter. I'm *going to appoint* a Mandinka[ ] interpreter. . . ." (Emphasis added.)

¶ 26 I disagree with the majority's reasoning that because the trial court did not make specific findings on Jadama's English abilities that the trial court did not, therefore, rule on Jadama's need for an interpreter. Rule 3–306(6)(A) of the Utah Rules of Judicial Administration, which governs the appointment of interpreters in judicial proceedings, appears to allow for a ruling of need without a specific determination regarding the degree to which a defendant has a limited ability to understand and communicate in English. The rule, in effect at the time, provided, *"When an interpreter is requested* or when the appointing authority determines that a principal party in interest or witness has a limited ability to understand and communicate in English, a certified interpreter shall be appointed. . . ." Utah R. Jud. Admin. 3–306(6)(A) (2009) (emphasis added). In this instance, Jadama and his defense attorney specifically requested a Mandinka interpreter and informed the trial court of the circumstances surrounding said request. Although the trial court did not make any finding regarding Jadama's English abilities,[1] nor does rule 3–306(6)(A) require such,[2] the record supports that Jadama's request was done with a basis in reason and with facts regarding his abilities. The trial court recognized Jadama's need and appointed an interpreter.

> In this type of case there is a serious possibility of grave injustice being done an accused by reason of his being unable to properly present his defense due to his inability to speak or understand the language in which the trial is conducted. Thus it is the duty of the Court to take whatever steps necessary to prevent injustice and, if necessary the Court should, on its own motion, appoint an interpreter for the defendant at the State's expense.

*State v. Karumai,* 101 Utah 592, 126 P.2d 1047, 1050 (1942).

¶ 27 I believe that the requirement to prevent injustice obligated the trial court, which after further interactions with Jadama considered him to be conversational in English, to ensure that Jadama also understood English well enough to properly present and participate in the case. The trial court's failure to specifically inquire or examine Jadama's ability to understand English when deciding to rescind the appointment of an interpreter is especially troublesome given that defense counsel specifically expressed concerns about Jadama's ability to understand.[3]

---

1. The trial court in speaking with Jadama stated, "I'm not sure how much or how little [English you speak]. That might be the subject of a future proceeding; do you understand that?"

2. I recognize that rule 3–306 of the Utah Rules of Judicial Administration has been amended to now require the appointing authority to make such a finding before being required to appoint a certified interpreter. The rule was repealed and reenacted effective November 1, 2009. *See* Utah R. Jud. Admin. 3–306 (2010) (notes). The amended rule provides that "if the appointing authority determines that a party, witness, victim or person who will be bound by the legal proceeding has a limited ability to understand and communicate in English, the appointing authority shall appoint a certified interpreter in the following cases: ... (4)(A)(i) criminal cases." *Id.* R. 3–306(4)(A).

3. For example, at a January 4, 2007 hearing, defense counsel requested an interpreter, stating, "[Jadama is] having some difficulty understanding the process, and I want to make sure he understands it completely." Defense counsel again expressed concern at the time the trial court determined that Jadama did not need an interpreter, stating that the

> request for an interpreter in part was on Mr. Jadama's request because there was some difficulty in understanding what was going on. Clearly, when you have a one on one conversation with him, it is not so difficult when there is two or more voices or a dialogue that is more than a one on one, it does get more difficult.

¶ 28 An individual's ability to interact in a basic, directed English conversation only requires a command of the language sufficient to convey and receive simple messages. A person may be conversational in English with a fairly limited vocabulary and may not have a command of the language sufficient to understand long or fast moving exchanges between two or more people which may include words, nuances, connotations, or idiomatic phrases unknown to the individual. Thus, Jadama's ability to converse one on one with his attorney, the trial court, and alienists does not necessarily demonstrate that he had a command of the language sufficient to understand the proceedings and the issues raised in those proceedings. As a result, it was not appropriate for the trial court to reverse its prior ruling that Jadama needed an interpreter without considering the actual extent of Jadama's claimed limited ability to understand English and making findings thereon. Likewise, it was inappropriate in the context of a previous request and granting of the request for the trial court to charge defense counsel with the task of moving for a hearing on the matter if counsel felt a formal hearing was necessary to establish whether an interpreter was needed. "It is far better to err by traveling a longer road or taking more time than to err by depriving one of a fair trial for want of understanding or comprehension of what is taking place." *State v. Vasquez*, 101 Utah 444, 121 P.2d 903, 906 (1942).

¶ 29 Under the circumstances, the trial court should have fully evaluated and made findings regarding Jadama's ability to understand English in the context of a felony trial and associated proceedings before reversing its prior ruling that Jadama needed an interpreter. However, I concur in the result of the majority opinion because Jadama does not, nor does the record, demonstrate that his English abilities materially affected his defense in this case.